**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jerry Don HOLLEY, Defendant–
Appellant.**

**No. 90–8523.**

United States Court of Appeals,
Fifth Circuit.

Sept. 13, 1991.

W.V. Dunnam, Jr., Waco, Tex., for defendant-appellant.

Ronald F. Ederer, U.S. Atty., San Antonio, Tex., Joe C. Lockhart, Asst. U.S. Atty., Fort Worth, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, GOLDBERG, and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Appellant-defendant Jerry Holley (Holley) appeals his conviction on two counts of perjury in violation of 18 U.S.C. § 1623.[1] Holley challenges his conviction on the ground, *inter alia,* that the district court's refusal to give a specific unanimity jury instruction denied him his right to a unani-

---

**1.** Section 1623 provides, in relevant part, as follows:

"(a) Whoever under oath (or in any declaration, certificate, verification, or statement

mous jury verdict. We agree and accordingly reverse and remand.

### Facts and Proceedings Below

In the latter half of 1985, Holley served as the chairman of the board of Peoples Savings and Loan (Peoples) of Llano, Texas. He was also a part owner of Peoples. His office was at the Peoples Mortgage Company, a Peoples subsidiary, in Dallas, Texas. In addition to attending board meetings, Holley actively solicited commercial real estate loans on behalf of Peoples. He also served on Peoples' senior loan committee, which was responsible for approving loans in excess of $250,000.

Holley was introduced to Eileen Marcus (Marcus) in 1985 for the purpose of conducting real estate transactions. Under the arrangement between Holley and Marcus, Marcus was to find property for sale and then a buyer for the property. They intended to realize a quick turnover profit on the purchase and immediate resale of the property to the buyer at a price above what they had paid. Peoples was to provide the financing for the purchase of the property.

Pursuant to her arrangement with Holley, Marcus signed a contract to purchase Southwest Parkway Plaza (the property) in Lewisville, Texas from Midway Development Company (Midway) for $2,400,000. The contract required that the buyer deposit with the Safeco Title Company (Safeco) an irrevocable letter of credit for $25,000 as earnest money on the purchase. The contract closing date was November 1, 1985.

Paulette Hubbard (Hubbard), an escrow agent employed by Safeco, received the contract for the property on September 10, 1985, from the real estate broker. She received the letter of credit, in the name of Peoples as issuer, on September 27, 1985, which was the origination date of the letter of credit.[2] By its terms, the letter of credit expired sixty days after its origination date. Some time after receiving the letter of credit, Hubbard noticed that it lacked a signature.

She spoke to Holley on October 11, 1985, to discuss the absence of a signature. Holley apologized and told her that it was an oversight. He made an appointment to meet with Hubbard at 9:00 a.m. on the following Monday. Hubbard went to Peoples' Dallas office at the arranged time and Holley was not there. Hubbard met an unidentified woman there who said that Holley had instructed her to sign the letter of credit on his behalf. This woman crossed out Holley's typed name as it appeared just below the signature line and signed the name "Mary Kam" on the signature line, writing "Secretary" just below that line.

The woman Hubbard met at Peoples was Carol Kam (Kam).[3] She worked as Holley's personal receptionist and secretary. On the morning that Hubbard was to meet with Holley, he instructed Kam that a woman would come by with some papers to sign and that Kam should sign them with her mother's maiden name, which is Mary Margaret Hilz. Her mother goes by her married name, Mary Margaret Kam. Carol Kam signed the letter with the name "Mary Kam." She did not know why she used that name instead of the name "Mary Margaret Hilz."

When Marcus failed to close, Midway sought to collect on the letter of credit, but Peoples refused to honor it on the stated grounds that the letter was not entered in

---

under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years, or both." 18 U.S.C. § 1623(a).

**2.** The letter of credit was on Peoples' letterhead and concluded with Peoples' typed name, just below which was "By" followed by a signature line. Under the signature line "Jerry Holley" was typed, and below that "Chairman."

**3.** In 1985, Kam went by the name of Carol Allegro when the relevant incidents occurred. Carol Kam was her maiden name. She was divorced in March 1985, and not long after she was terminated by Peoples. In November 1985 she resumed use of the name Carol Kam.

its register of letters of credit and that the president of Peoples, Joel Daniel (Daniel), was unable to learn who Mary Kam was.

Around the time that Marcus and Holley attempted to purchase Southwest Parkway Plaza, Marcus, in furtherance of her arrangement with Holley, signed a contract to purchase another property known as the Arapaho Station Shopping Center (Arapaho) in Richardson, Texas. The contract Marcus signed for the purchase of Arapaho required that she submit earnest money in the amount of $500,000. Holley signed a $500,000 Peoples letter of credit as earnest money, which, although Marcus failed to close, was never cashed by the sellers. Marcus and Holley intended to realize a quick turnaround profit on Arapaho as well.

Marcus was never required, as condition of the issuance of the letter of credit with respect to either of the transactions described above, to complete a credit application or file a financial statement with Peoples. She also was never required to provide any collateral for the extension of credit or to sign a promissory note in order to have the letters of credit issued on her behalf.

In January 1988 Holley filed his voluntary bankruptcy petition in the United States Bankruptcy Court for the Western District of Texas, Waco division. On April 6, 1988, Peoples filed in Holley's pending personal bankruptcy case an adversary action in the form of a complaint to establish and determine dischargeability of alleged debts of Holley to Peoples. Peoples filed an amended complaint (hereafter referred to simply as the complaint) in October 1988. There were no further amendments. Pursuant to formal notice filed therein by Peoples, Holley was deposed in connection with this adversary proceeding on December 21, 1988, December 22, 1988, and January 9 and 10, 1989.[4] On May 15, 1990, Holley was indicted on two counts of perjury, in violation of 18 U.S.C. § 1623, on the basis of statements he made in the course of that deposition.

The indictment charges Holley with two counts of perjury.[5] In each count, a sec-

---

**4.** The text of Holley's entire deposition is included in the record.

**5.** The indictment reads as follows:

"COUNT 1
[18 U.S.C. § 1623; Perjury]

A. INTRODUCTION

1. The Federal Home Loan Bank Board (Bank Board) was an agency of the United States established to examine, regulate and supervise savings and loan institutions insured by the Federal Savings and Loan Insurance Corporation (FSLIC).

2. Peoples Savings and Loan Association (Peoples Savings), a Texas corporation, had been a state chartered savings and loan association, the accounts of which were insured by the FSLIC. Peoples Savings was located in Llano, Texas.

3. Peoples Mortgage Company (Peoples Mortgage), a Texas corporation, had been a wholly owned subsidiary of Peoples Savings. Peoples Mortgage maintained an office at 8222 Douglas Avenue, Dallas, Texas.

4. Midway Development Company was a Texas corporation that in 1985 was offering for sale a shopping center known as the Southwest Parkway Plaza.

5. The defendant JERRY DON HOLLEY was the former owner and Chairman of the Board of Peoples Savings and had worked at the office of Peoples Mortgage at 8222 Douglas Avenue, Dallas, Texas.

6. Carol Allegro was a former secretary to the defendant JERRY DON HOLLEY and had worked at the office of Peoples Mortgage at 8222 Douglas Avenue, Dallas, Texas. Carol Allegro's maiden name was Carol Kam. Her mother's name was Mary Kam.

7. Paulette Hubbard was a vice-president of Safeco Title Company, a Texas corporation, and had been an escrow agent for Midway Development Company.

8. Eileen (sometimes spelled Eilien) Marcus had been a business partner of the defendant JERRY DON HOLLEY. Defendant HOLLEY and Marcus had agreed that Marcus would enter into a contract to purchase the Southwest Parkway Plaza shopping center and that defendant HOLLEY would supply a $25,000 letter of credit to be used as the earnest money deposit on said contract.

B. THE DEFENDANT'S TESTIMONY

9. On the 22nd day of December, 1988, in the Waco Division of the Western District of Texas, the defendant JERRY DON HOLLEY, having duly taken an oath that he would testify truthfully, testified on his oath in a deposition taken in connection with proceedings in the United States Bankruptcy Court, Western District of Texas, Waco Division.

10. At the time and place alleged, counsel for Peoples Savings, were conducting an investigation to determine, in part, whether federal civil laws had been violated in connection with the issuance of a $25,000 letter of

credit on the accounts of Peoples Savings for the benefit of Eileen Marcus.

11. It was material to the bankruptcy proceeding whether the defendant JERRY DON HOLLEY had knowledge regarding the execution of a letter of credit issued in the amount of $25,000 for the benefit of Eileen Marcus.

12. At the time and place alleged, the defendant JERRY DON HOLLEY, appearing as a witness under oath being deposed in connection with a federal bankruptcy proceeding, knowingly did make false, material declarations which are underlined below, in the course of some of his testimony during the deposition which is set forth below. During his deposition, the defendant JERRY DON HOLLEY was asked a number of questions and made a number of declarations, including the following questions (Hereafter a question will be introduced by the letter Q.) and the following declarations (Hereafter defendant JERRY DON HOLLEY'S declarations will be introduced by the letter A.).

Q. Okay. Why don't you take a look at Exhibit Number 262. Have you ever seen that before? The record I guess should reflect it's another irrevocable standby letter of credit from Peoples Savings and Loan on behalf of Eileen Marcus for $25,000.00 to Midway Development Company, and on Page 2, the signature says, 'By Jerry Holley' which is crossed out, and then it is signed, 'Mary Kam, Secretary.' I guess my first question is: Have you ever seen this before?
A. Yes, I have.
Q. When was the first time you saw it?
A. I don't recall.
Q. Did you see it when it was signed? Were you present when it was signed?
A. No, I was not present when it was signed.
Q. Were you present when it was drafted?
A. No, I was not.
Q. Do you recall what connection you saw this before?
A. Vaguely I can recall some facts that I think might clear it up.
Q. Okay, if you would.
A. I may have the chronological order maybe mixed up, but I think Eileen Marcus had first found another shopping center, and according to what I was looking at a minute ago, this one was found September 27, 1985, roughly, whereas, the one on Arapaho Station was October 18th of '85, and she talked to Joel again earlier about this letter of credit, and she signed a contract herself to buy this particular shopping center, but either the agent or Midway Development Company kept on calling her, and they even called me and said, 'Well, how come we don't have the letter of credit from Eileen Marcus?' The long and the short of it was that Joel had not checked her out thoroughly enough to issue a letter of credit. *This Mary Kam, I understand, is an employee of Midway Development Company or the agent, but she was no employee or agent or even friend of Peoples Savings and Loan, me, Joel Daniel, or anybody. The letter of credit never was issued.*

Q. Well, let me make some representations to you, and you can check them out, and I'll be happy to provide the documentation. Let me represent to you that this letter of credit was signed in your office at 8222 Douglas, that somebody from the title company brought it over, that ultimately they attempted to collect on it, that there was some litigation over it, and that it was ultimately decided that they couldn't collect on it because there was nobody named Mary Kam who was authorized to sign it at Peoples but that the person who signed as Mary Kam was sitting in your office where I assume your secretary normally would sit. Does that refresh your recollection in any way?
A. *No. No. I know for a fact that that was not any of my employees who signed a letter of credit. There must be, in fact, a Mary Kam that worked for one of those companies I just mentioned.*
Q. You personally never authorized this letter of credit?
A. *Not at all, no.*
Q. And you never discussed with Joel the issuance of this letter of credit?
A. *I may have discussed it with him, but it was never issued by Joel Daniel or myself or any employee of Peoples Savings and Loan.*
Q. If I understand right, and again correct me if I'm wrong, you and Joel had discussions about the fact that she needed a letter of credit, but neither you nor Joel felt that it was appropriate to issue this letter of credit, so it was never, in fact, to the best of your knowledge issued?
A. I don't think Joel had the proper documentation at the time to do it. I think he asked her for the credit application whatever was necessary to do it, and at that particular time, he didn't have documentation.

13. The above underlined declarations made under oath by the defendant JERRY DON HOLLEY were material and to the defendant's knowledge false, in that when he was being deposed on December 22, 1988, JERRY DON HOLLEY knew that (1) he had told Paulette Hubbard to bring the unsigned $25,000 letter of credit, which was drawn on the accounts of Peoples Savings for the benefit of Eileen Marcus, to his office to be executed, (2) that he had told his secretary, Carol Allegro, to sign the letter of credit for him using her mother's name, and (3) that he had told Ms. Allegro to give the fraudulently executed letter of credit to Paulette Hubbard.

All in violation of Title 18, United States Code, Section 1623.

### COUNT 2
[18 U.S.C. § 1623; Perjury]

1. Paragraphs 1 through 8 of Count 1 are hereby realleged and incorporated as though set forth in full herein.

2. On the 10th day of January, 1989[ ] in the Waco Division of the Western District of Texas, the defendant JERRY DON HOLLEY, having duly taken an oath that he would testify truthfully, testified on his oath in a deposition taken in connection with proceedings in the United States Bankruptcy Court, Western District of Texas, Waco Division.

3. At the time and place alleged, counsel for Peoples Savings, were conducting an investigation to determine, in part, whether federal civil laws had been violated in connection with the issuance of a $25,000 letter of credit on the accounts of Peoples Savings.

4. It was material to the bankruptcy proceeding whether the defendant JERRY DON HOLLEY had knowledge regarding the execution of a letter of credit issued in the amount of $25,000 for the benefit of Eileen Marcus.

5. At the time and place alleged, the defendant JERRY DON HOLLEY, through his counsel, Vance Dunnam, requested that he be allowed to clarify statements made earlier during the taking of his deposition on December 22, 1988. In making said clarifications the defendant JERRY DON HOLLEY knowingly did make false, material declarations under oath which are underlined below. During his testimony, the defendant JERRY DON HOLLEY was asked a number of questions by Richard Kamp, an attorney for Peoples Savings, and made a number of declarations, including the following questions by Mr. Kamp and the following declarations by the defendant JERRY DON HOLLEY.

MR. DUNNAM: Jerry has a clarification to make in his deposition with regard to this.
MR. HOLLEY: I know now what happened on this one we're talking about, this Mary Kam deal. *The real estate agent came to me through Eileen Marcus and said that Midway Development Company had been stung before on a letter of credit, and they wanted to see a copy of an LC, unsigned, that was not proper that could be called upon, just to have their lawyer study the LC to see if in fact that would be appropriate for them to accept.*
It was sent down by someone at our association from a phone call by me. A copy, unsigned, typed up by someone at the association, was sent down either to me or directly to Midway Development Company. *During that course of time while they were studying this LC, it was determined she was not creditworthy and no one at that particular time would in fact sign the LC.*
*Time got down to the wire, and they went ahead and someone at Midway Development or the broker representing the company transaction signed the LC anyway, hoping it would go through. But that was just strictly a copy sent for their benefit to review to see if they would accept the LC. That's what happened.*

MR. KAMP: Somebody at the title company asked you for a sample letter of credit?
MR. HOLLEY: *Yes, from Midway Development Company, through their agent or through their broker.*
MR. KAMP: As opposed to going to a lawyer or asking the lawyer for one? Was this for their lawyer's benefit?
MR. HOLLEY: *In order for them to sign a contract that was binding, they wanted to make sure that the LC was acceptable. They wanted a solid LC, so we requested an LC be sent to them directly so they could study it with their attorney to make sure that they would accept the LC, that they had no clause in the LC that it was not an irrevocable line of credit. So it was sent to them unsigned for them to study, and then at some period of time in the future it was to have been signed.*
*But after the credit check was done, we decided we would not sign the LC. Just sending an LC unsigned didn't mean anything, but it was giving them an opportunity to study it to see if they would accept it. That's what happened.*
MR. KAMP: Were you dealing with Midway Development Company at the time?
MR. HOLLEY: · With the broker.
MR. KAMP: So there was a broker from Midway Development Company that you had some sort of an ongoing relationship with?
MR. HOLLEY: Yes.
MR. KAMP: And I assume then as a favor to her, or she said to you, 'You know, I would like to see a decent letter of credit so that in case I have to get one in the future I know what one looks like,' or something like that?
MR. HOLLEY: *No, they wanted to make sure our LC would be acceptable to them.*
MR. KAMP: Oh, your letter, Peoples' letter of credit?
MR. HOLLEY: *Yes. They wanted to make sure our LC was acceptable. You can word a letter of credit a lot of different ways, and they wanted to study that LC to make sure it was acceptable to them. If it had flaws in it, it wasn't worth anything to them.*
MR. KAMP: So in other words, they wanted to see a sample of Peoples' letter of credit in anticipation of a deal that was going to be done with Eileen Marcus and Peoples?
MR. HOLLEY: *That's correct.*
MR. KAMP: And so in anticipation I suppose of the deal that you were contemplating doing, and I guess that would have been the Arrapahoe Station deal, you had one of these sent so that they would be able to see what Peoples' form looked like?
MR. HOLLEY: No. This was on another shopping center that was separate and apart from Arrapahoe Station that she intended to do. I went out and looked at this shopping center also. *I called someone at the*

tion of Holley's deposition testimony is quoted and portions of this quoted testimony are underlined. Each count charges that in the deposition Holley did knowingly

*association, Lloyd Kitchen or Joel or somebody, and asked them to send a sample copy of our LC, which was done for their chance to view it.* This is a separate deal from Arrapahoe Station.

MR. KAMP: But there was a deal that was contemplating being done that Peoples was going to finance for Eileen Marcus, and Midway Developing [sic] Company was in some way involved?

MR. HOLLEY: They were the seller.

MR. KAMP: Okay, they were the seller. They were going to require a letter of credit on behalf of Eileen Marcus, and I guess she represented to them that Peoples was gong to do it.

MR. HOLLEY: That's right.

MR. KAMP: And they wanted to make sure that everything went through, so they asked you for a sample. You called down and somebody at the association drafted this and sent it to you, and you furnished it to Midway Development?

MR. HOLLEY: *That's exactly right.*

MR. KAMP: When they went ahead and signed this thing and tried to call it, didn't that make you mad?

MR. HOLLEY: *Well, I didn't know about it till after it was sent to Peoples. Sure it made me mad, and I found out that it was someone either at Midway Development or the broker's house that did this.*

MR. KAMP: Well, when you got mad and found out about it, what did you do about it? Did you talk to anybody over there and complain, or what?

MR. HOLLEY: Well, first of all, it was not even—it wasn't signed by anyone that was authorized so it wasn't any good anyway, and they knew that.

MR. KAMP: But still, they attempted to defraud your association out of $25,000.

MR. HOLLEY: Well, Joel or Lloyd or someone called me and told me what had happened.

MR. KAMP: I understand. I'm not saying that you tried to defraud them out of $25,000. What I'm saying is that somebody tried to defraud Peoples out of $25,000. I mean they didn't take this over to Peoples as a joke. I'll represent to you—in fact I will show you that apparently they contemplated a lawsuit over the thing.

MR. HOLLEY: *Either someone from Midway Development or the title company or the broker had one of their employees sign the letter. It could have even been the title company, but some—and I tried to trace this down, and it was one of these three places. It could have been the title place that did this.*

MR. KAMP: That's what I'm asking you. Obviously somebody tried to defraud your institution out of $25,000.

MR. HOLLEY: Right.

MR. KAMP: And I'm just asking you what you did about it or tried to do about it since, you know, that's $25,000.

MR. HOLLEY: I remember getting several phone calls from either the broker or the title company wanting to know, 'When are you going to get this LC to us?' And I said, 'Well, we haven't got the credit approved yet.'

*When it came down to the hour the conflict [sic] was going to be nullified, cancelled because of time limits, they went ahead and had someone there sign the LC and send it on through.*

MR. KAMP: I understand that, but what I am asking you is when you found out that the letter of credit had been signed by somebody who didn't even work at Peoples, and that they had made an attempt to cash it, somebody had made an attempt to defraud Peoples out of $25,000, what did you do about it?

MR. HOLLEY: No more than told Joel or Marvin about what had happened.

MR. KAMP: And left it to them to do if anything was going to be done?

MR. HOLLEY: Well they didn't honor the LC, so there wasn't anything else to do I don't guess.

MR. KAMP: Did you have any conversations, you personally, with anybody over at Midway about this?

MR. HOLLEY: The broker I did, and Eileen Marcus.

MR. KAMP: And what was their explanation for why this thing went through?

MR. HOLLEY: I don't recall.

MR. KAMP: And did Eileen Marcus offer any explanation as to why this went through?

MR. HOLLEY: I don't recall at this time.

13. The above underlined declarations made under oath by the defendant JERRY DON HOLLEY were material and to the defendant's knowledge false, in that when he was being deposed on January 10, 1989, the defendant knew (1) that no broker, agent, or other person connected with the contract between Midway Development Company and Eileen Marcus had requested a sample letter of credit, (2) that he had told Paulette Hubbard to bring the unsigned $25,000 letter of credit, which was drawn on the accounts of Peoples Savings for the he [sic] benefit of Eileen Marcus, to his office to be executed, (3) that he had told his secretary, Carol Allegro, to sign the $25,000 letter of credit for him using her mother's name, and (4) that he had told Ms. Allegro to give the fraudulently executed $25,000 letter of credit to Paulette Hubbard.

All in violation of Title 18, United States Code, Section 1623."

make the false and material declarations that are the underlined portions of the quoted testimony. In the first count, testimony from Holley's deposition taken on December 22, 1988, is quoted and material in four of his responses is underlined. In the second count, testimony from statements Holley made on January 10, 1990, is quoted and material in eleven of his responses is underlined.[6]

At trial, Holley contended that the government had failed to prove that his statements were material. He also objected to the court's jury instructions respecting the unanimity requirement on the ground that the court failed to instruct the jury that it must be unanimous as to at least one particular statement in each count. The district court overruled Holley's objections. The court instructed the jury that, in order to find Holley guilty, it must find beyond a reasonable doubt that Holley's testimony "was false in one or more of the respects charged in" the proceeding pursuant to which the testimony was given.

The jury found Holley guilty on both counts. The district court sentenced him to concurrent sixteen-month terms of imprisonment and concurrent three-year terms of supervised release on each count. The court also ordered him to pay a $25,000 fine and a $100 special assessment. Holley timely appealed.

## Discussion

On appeal, Holley asserts several grounds of error. He claims that there was insufficient evidence to support the jury's verdict with respect to either count because the government failed to adduce sufficient evidence of the materiality of the alleged perjury, an essential element of the offense charged. He also claims that the district court committed reversible error by failing to instruct the jury that it must be unanimous with respect to at least one statement in each count of the indictment in order to find him guilty.

6. Holley's deposition, which commenced December 21, 1988, continued on December 22, 1988, at which time it recessed until, and recommenced on, January 9, 1989. On January 9 Holley was sworn again by the court reporter, and the deposition continued throughout that day until at 4:00 p.m. Peoples' lawyer, Mr. Kamp, said "Well, it's a minute to 4:00, so I'm going to stop." Holley replied "Thank you." Kamp then said: "Why don't we say sometime in the next two weeks, if you want to reconvene and put anything on the record, we will reconvene at a mutually convenient time and place and you can put anything on the record that you want." Holley responded "Okay. Thank you." There were no further proceedings that day. On the next day, January 10, 1989, during the oral deposition of Daniel taken by Peoples in the same adversary proceeding before the same court reporter taking Holley's January 9 deposition, at which Daniel deposition Holley and his counsel, Mr. Dunnam, were present, there was a break during which an on-the-record discussion before the reporter between Peoples' counsel, Mr. Kamp, Holley, and Mr. Dunnam took place. Mr. Kamp suggested Holley had said something to Daniel earlier during that break to the effect that Daniel's testimony indicated that Holley's previous deposition testimony was incorrect in one or more respects. Holley acknowledged he had been in error, saying "It was an honest mistake, and I remember that now." Kamp then stated "If you want to clarify that on the record—can you add a page to the deposition that we took yesterday?" Holley again said "I made a mistake in that portion of my testimony." Kamp then responded "we can clarify that" and went on to say "but I would like to just make sure we get everything on the record, and ultimately all our interests will probably be protected." Mr. Dunnam responded "I'll agree." Following some further statements by Kamp and Holley, there occurred the testimony of Holley quoted in count two of the indictment, as prefaced by Dunnam's there-quoted statement: "Jerry has a clarification to make in his deposition with regard to this." Following all of that testimony by Holley there was further testimony by Holley prefaced by a statement by Dunnam: "He wants to make one correction." These January 10 proceedings were transcribed under the heading "addendum to Mr. Holley's deposition as taken on 1–10–89" and were put in the same single volume along with, and just after, the transcription of the January 9 Holley deposition testimony, and were covered by the same single certificate of the deposition court reporter. This volume (along with the volumes of the December 21 and 22 Holley deposition testimony) was furnished to Holley to be read and signed and to make corrections on. Holley read these volumes of transcriptions, but made no corrections.

We find that the deposition statements that were the basis of Holley's indictment were material to the proceeding pursuant to which he was deposed. We also find, however, that the district court committed reversible error by failing to instruct the jury that it must unanimously agree that Holley perjured himself with respect to at least one statement in each count charged in the indictment. We accordingly reverse and remand.[7]

**A. Materiality**

Holley contends that the subject of the deposition testimony that formed the basis of his perjury conviction was not material to the issues raised in Peoples' complaint. The complaint, Holley notes, lists several specific instances of fraudulent conduct by Holley but fails to refer even once to the letter of credit transaction. Holley also notes that the letter of credit transaction involved fraud against a third party other than Peoples and the specific transactions alleged in the complaint alleged fraud against Peoples.

The government contends that although the complaint did not list the letter of credit transaction as a specific instance of fraudulent conduct, the transaction was material because it increased the likelihood that the fact finder would conclude that Holley had committed the fraudulent acts that were specified in the complaint. The acts that were specified in the complaint occurred roughly contemporaneously with the letter of credit transaction and these acts similarly involved Holley's making of loans without obtaining adequate loan applications or financial statements. The government also claims that the letter of credit transaction was material to the general allegation in Peoples' complaint that Holley had made loans without obtaining the requisite documentation.

To obtain a perjury conviction, the government must prove that Holley's statements were, at the time made, material to the proceeding in which his deposition was taken. *United States v. Gremillion*, 464 F.2d 901, 904–05 (5th Cir.), *cert. denied*, 409 U.S. 1085, 93 S.Ct. 683, 34 L.Ed.2d 672 (1972). "Materiality is a legal question to be decided by the court and is not an issue for the jury to determine." *Id.* at 905. We recently stated that "[t]he most common formulation of [the materiality concept] is that a concealment or misrepresentation is material if it ' "would have the natural effect or tendency to influence" ' the decision of the tribunal to which it is addressed." *United States v. Salinas*, 923 F.2d 339, 341 (5th Cir.1991) (quoting *United States v. Thompson*, 637 F.2d 267, 268 (5th Cir.1981) (quoting *Gremillion*, 464 F.2d at 905)).

In the instant case, Holley's false testimony was given during a civil deposition pursuant to an adversary proceeding brought by Peoples in Holley's bankruptcy case to determine the dischargeability of Holley's debts. The record does not reflect that there ever was a trial or other hearing on the adversary proceeding, or that any formal court use in that proceeding was ever made of deposition testimony.[8] Holley contends that the areas of inquiry that

7. Additionally, Holley challenges the district court's jury instructions on diverse other grounds and claims that the court erred in refusing to admit the testimony of an expert witness on the usual and customary practices of court reporters in administering the oath. He also contends that the court committed reversible error by allowing the indictment to be given to the jury. In view of our disposition, we do not address these contentions.

Holley further contends, without citation of relevant authority, that his conviction on count two must be set aside because the evidence does not show (as indeed it does not) that he was resworn on January 10. We reject this contention and agree with the government that (under all the particular circumstances here) there was sufficient evidence from which the jury could rationally conclude that Holley's January 10, 1989 testimony alleged in the indictment was a continuation of his sworn testimony in the January 9, 1989 deposition and was given under the oath he then took.

8. The record does indicate that the bankruptcy court entered an order on March 1, 1990, discharging Holley's debts. Holley has informed us through counsel that the district court dismissed Peoples' adversary proceeding on May 8, 1991, by an order reciting that Peoples' counsel advised the court on May 2, 1991, that "it did not intend to pursue its claims in this matter."

can be considered material in a deposition cannot extend beyond the areas of inquiry that would be permissible—and the evidence that would be admissible—at trial. Holley therefore contends that materiality must be limited to issues specifically raised in Peoples' pleadings and that these issues must be confined to fraudulent transactions which resulted in a loss to Peoples. Because the parties to the deposition stipulated that objections to questions would be waived until trial, Holley argues, he did not have the opportunity to exclude immaterial matter from the scope of inquiry.

Courts have long recognized the broad scope of discovery, *see generally* 8 C. Wright & A. Miller, *Federal Practice & Procedure* § 2007 (1970), and as noted in a famous passage of the Supreme Court:

> "[T]he deposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case. Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession." *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947) (footnote omitted).

Holley would require that the scope of materiality with respect to testimony given at a deposition be narrower than the permissible scope of deposition testimony as expressly envisioned in the Federal Rules of Civil Procedure. Rule 26(b)(1) of the Federal Rules permits discovery of information that would be inadmissible at trial "if [it] appears reasonably calculated to lead to the discovery of admissible evidence." Ordinarily, there would appear to be no sufficient reason why a deponent should not be held to his oath with respect to matters properly the subject of and material to the deposition, even if the informa-

tion elicited might ultimately turn out not to be admissible at a subsequent trial. In assessing the materiality of statements made in a discovery deposition, some account must be taken of the more liberal rules of discovery.

Peoples claimed in their complaint that Holley had "engaged in a course of conduct which constituted fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny within the meaning of 11 U.S.C. § 523(a)(4)." [9]

The complaint alleges that Holley acted fraudulently with respect to three specific transactions, which it describes in detail, and it also alleges that Holley, as a member of the senior loan committee, approved loans in violation of the applicable "loans to one borrower" rules of state and federal law. The complaint further asserts that Holley violated his fiduciary duty to Peoples by voting on loans to partnerships in which Holley had a financial interest and that he improperly charged personal expenses to Peoples. In addition, the complaint generally alleges as follows:

> "31. In December 1983, Holley and Haass established the Senior Loan Committee at Peoples, which Committee consisted solely of Holley, Haass and Joel Daniel and had authority to make and approve loans in excess of $250,000.00 to the exclusion of the Board of Directors. Holley, as Chairman of the Board and a member of the Senior Loan Committee and Haass, as Vice Chairman and fellow member proceeded to: (1) allow loans to be funded without committee approval; and (2) approved many loans without adequate applications, financial statements, appraisals or credit reports all of which were in violation of applicable law, rules and regulations. Among these loans were the White loan and the Corona loan. The actions of Holley as Chairman and as a member of the Senior Loan Committee, resulted in substantial losses to Peoples in excess of $10 million." [10]

---

**9.** This provision of the Bankruptcy Code prohibits discharge of an individual debtor's debts "for fraud or defalcation while acting in a fiduciary

capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

**10.** Haass was a major shareholder in Peoples. The "White loan" and the "Corona loan" are two

The deposition inquiries respecting the letter of credit are clearly related to the allegations contained in paragraph 31 of the complaint. The letter of credit was issued while Holley was a member of the senior loan committee and it constituted an extension of credit—in substance a loan—to Marcus. It was issued without committee approval and the necessary credit approvals had not been completed in violation of applicable regulations. Moreover, the letter of credit matter had some tendency to show Holley's state of mind and motives in respect to his carrying out his duties at Peoples. *See* Federal Rules of Evidence 404(b). It is possible that at trial evidence concerning the letter of credit transaction would have been excludable under Federal Rules of Evidence 403, particularly as Peoples ultimately suffered no actual loss therefrom, but inquiries respecting this transaction plainly fell within topics material to Peoples' complaint. *See Salinas.*

Furthermore, the issuance of the letter of credit in accordance with Holley's instructions was directly relevant to the heart of Peoples' complaint. Virtually every allegation in the complaint directly or indirectly charged Holley with making loans without obtaining the necessary approvals in violation of his fiduciary obligation to Peoples and in violation of applicable state and federal laws. The essence of Holley's apparent theory of defense to the charges in the complaint, as reflected in his deposition testimony, was that his role at Peoples was limited to finding potential borrowers. He repeatedly stated that Daniel was solely responsible for ensuring that proper procedures were followed and that the necessary paperwork was completed. Holley expressly denied that he had ever signed or issued any letter of credit on behalf of Peoples. Thus, any transaction pursuant to which Holley *had* issued a letter of credit on behalf of Peoples would be relevant, regardless of whether that transaction ultimately resulted in a loss to Peoples. *Cf. United States v. Giarratano,* 622 F.2d 153 at 156 (5th Cir.1980).

of the three specific transactions described else-

We hold that the materiality of the statements is established.

**B. Unanimity.**

Holley claims that the district court erred in overruling his timely objection to the failure of the charge to inform the jury that it must be unanimous as to his perjury in at least one particular statement in each count in order to find Holley guilty on that count. *See* Fed.R.Crim.P. 31(a) (jury verdict must be unanimous); *United States v. Gipson,* 553 F.2d 453, 456 (5th Cir.1977) (Sixth Amendment requires unanimous verdict in federal criminal trial). The government contends that no specific unanimity instruction was required and that if such an instruction was required, the charge was adequate to protect Holley's right to a unanimous verdict.

As Justice Blackmun recently observed in his separate concurrence in *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 1234, 1237 n. 5, 108 L.Ed.2d 369 (1990): "[i]n federal criminal prosecutions, where a unanimous verdict is required, the Courts of Appeals are in general agreement that '[u]nanimity ... means more than a conclusory agreement that the defendant has violated the statute in question; there is a requirement of substantial agreement as to the principal factual elements underlying a specified offense.'" (quoting *United States v. Ferris,* 719 F.2d 1405, 1407 (9th Cir.1983)). *See also United States v. Gipson,* 553 F.2d 453, 456–459 (5th Cir.1977). We have previously stated that

> "[t]he unanimity rule thus requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged. Requiring the vote of twelve jurors to convict a defendant does little to insure that his right to a unanimous verdict is protected unless this prerequisite of jury consensus as to the defendant's course of action is also required." *Id.* at 457–58.

"In the routine case, a general unanimity instruction will ensure that the jury is

where in the complaint.

unanimous on the factual basis for a conviction, even where an indictment alleges numerous factual bases for criminal liability." *United States v. Beros,* 833 F.2d 455, 460 (3d Cir.1987); *see United States v. North,* 910 F.2d 843, 876 (D.C.Cir.1990); *United States v. Duncan,* 850 F.2d 1104, 1113 (6th Cir.1988); *United States v. Payseno,* 782 F.2d 832, 835 (9th Cir.1986). However, such an instruction will be inadequate to protect the defendant's constitutional right to a unanimous verdict where there exists a "genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts." *Duncan,* 850 F.2d at 1114 (citing *Beros,* 833 F.2d at 460–62). *See Payseno,* 782 F.2d at 836–37; *United States v. Echeverry,* 698 F.2d 375, 376–77, *modified on other grounds,* 719 F.2d 974 (9th Cir.1983); *Gipson,* 553 F.2d at 458.

In *Gipson,* we held that where a jury could find that a defendant was guilty on a single count under multiple theories of liability, a specific unanimity instruction was constitutionally required. 553 F.2d at 459. The defendant in *Gipson* was charged with the offense of receiving, concealing, storing, harboring, selling and disposing of stolen vehicles in violation of 18 U.S.C. § 2313. The Court found that the offense charged comprised two conceptual groupings or offenses: (1) receiving, concealing, or storing and (2) bartering, selling or disposing. We held that the district court committed reversible error by refusing to give the jury a specific unanimity instruction that it must unanimously agree as to guilt under one conceptual grouping in order to convict the defendant. In *North,* the D.C. Circuit observed "When a statute criminalizes false statements, for example, each false statement charged in a single count is properly treated as a distinct conceptual grouping; to convict, the jury must unanimously agree upon which one of those statements the defendant made." *Id.* 910 F.2d at 876. *See also Duncan,* 850 F.2d at 1110–1113 (where single count charged two separate false statements, jury must be unanimous as to at least one specific statement); *Ferris,* 719 F.2d at 1407 (Kennedy, J.) (special

unanimity instruction appropriate where a single count charges "separate false statements, any one of which is sufficient to convict").

The Supreme Court recently addressed the issues raised by *Gipson* in *Schad v. Arizona,* ——— U.S. ———, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). The defendant in *Schad* was found guilty in an Arizona court of first-degree murder by a unanimous jury verdict and was sentenced to death. The trial court had instructed the jury that it must reach a unanimous verdict that the appellant committed first degree murder, which was defined as premeditated murder or felony murder. The jury was not required to reach a separate verdict with respect to either premeditated murder or felony murder. Appellant challenged his conviction on the grounds of the Sixth, Eighth and Fourteenth Amendments, claiming a constitutional right to a unanimous jury in state capital cases as distinct from cases in which lesser penalties are imposed.

Justice Souter, writing for four justices including himself, authored the Court's opinion. He rejected appellant's Sixth and Eighth Amendment claims on the ground that "petitioner's real challenge is to Arizona's characterization of first-degree murder as a single crime as to which a verdict need not be limited to any one statutory alternative, as against which he argues that premeditated murder and felony murder are separate crimes as to which the jury must return separate verdicts." *Id.* 111 S.Ct. at 2496. Justice Souter stated the central issue as being whether it was constitutionally permissible to allow a "general verdict predicated on the possibility of combining findings of what can best be described as alternative mental states, the one being premeditation, the other the intent required for murder combined with the commission of an independently culpable felony." *Id.*

Justice Souter criticized *Gipson's* conceptual grouping of theories of liability as being too indeterminate and metaphysical. He stated that "[a]lthough the classification of alternatives into 'distinct conceptual

groupings' is a way to express judgment about the limits of permissible alternatives, the notion is too indeterminate to provided concrete guidance to courts faced with verdict specificity questions.... In short, the notion of 'distinct conceptual groupings' is simply too conclusory to serve as a real test." *Id.* 111 S.Ct. at 2498–99.

Justice Souter found that the trial court's instruction was permissible on two grounds. First, he reasoned that while sufficiently distinct requisite mental states might require separate jury verdicts, such verdicts were not required where the mental states "reasonably reflect notions of equivalent blameworthiness or culpability." *Id.* at 2503. Second, he noted that the equating of the two mental states "as species of the blameworthy state of mind required to prove a single offense of first-degree murder finds substantial historical and contemporary echoes." *Id.* at 2501.

Justice Scalia, concurring separately, concluded that the Court's historical argument was dispositive of appellant's due process claim. In the absence of historical precedent favoring the state's position, however, Justice Scalia indicated that he likely would have sided with the dissenters on the ground that the reasonableness of equating the different mental states was not itself sufficient to allow only one verdict with respect to premeditated murder and felony murder. *Id.* at 2505–07. Four justices dissented in *Schad.*

Holley's case, however, is somewhat different from *Schad.* In *Schad,* there was a single killing of one individual, and Justice Souter, stressing that under Arizona law first degree murder was "a single crime," concluded that there was no more need for jury unanimity as to alternative mental states each satisfying the *mens rea* element of the offense than there was for the jurors to all agree on the precise means employed to cause death. *Id.* 111 S.Ct. at 2495–97.[11] This differs, however, from the situation where a single count as submitted to the jury embraces two or more separate offenses, though each be a violation of the same statute. As Justice Scalia points out in his *Schad* separate concurrence, "We would not permit, for example, an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday." *Id.* at 2507. Holley contends that each count alleges multiple separate false statements, each knowingly made and material, so that each such separate statement is of itself a sufficient basis for violation.

As noted above, Holley's indictment, which was read ("rather hurriedly," the district court said) to the jury by the district court and a copy of which was provided to the jury during its deliberations, includes quoted sections of Holley's deposition. Part or all of four of Holley's responses to questions quoted in count one are underlined. The quoted material is prefaced by the allegation that Holley "knowingly did make false, material declarations which are underlined below, in the course of some of his testimony during the deposition which is set forth below." In the underlined parts of the deposition, Holley generally states that Mary Kam was not an employee of Peoples or of his, that the letter of credit was never issued, that none of his employees signed the letter of credit, that he never personally authorized the signing of the letter of credit and that the letter of credit was not issued by Holley or any Peoples employee.[12]

Part or all of eleven of Holley's responses to questions quoted in count two are

---

**11.** Respecting not requiring juror unanimity as to which of several possible legally equivalent means were employed to commit a single crime, Justice Scalia in his *Schad* separate concurrence observes:

"... [I]t has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission. [Citations omitted]. That rule is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict. When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believe he left her unconscious and set the fire to kill her." *Id.* 111 S.Ct. at 2506.

**12.** The last paragraph of the first count provides that:

"[t]he above underlined declarations made under oath by the defendant [Holley] were

underlined. The underlined deposition testimony is prefaced by the statement that Holley "knowingly did make false, material declarations under oath which are underlined below." In the quoted testimony Holley generally states that a real estate agent for Midway requested a sample letter of credit to ensure that the form of the letter was acceptable and because Midway "had been stung before"; that Holley ordered that a sample letter be sent; and that the real estate agent or someone at the title company or at Midway signed the sample letter of credit after it was sent.[13]

The indictment in the instant case raises an issue similar to the issue of duplicity addressed by this Court in *Bins v. U.S.*, 331 F.2d 390 (5th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 149, 13 L.Ed.2d 87 (1964). In *Bins*, the defendant was charged, *inter alia*, on two counts of making a false statement for the purpose of obtaining a loan from the Federal Housing Administration. Each count alleged the making of a false statement on two separate loan application forms. The Court stated that, for purposes of the requirement that separate offenses joined in the same indictment be stated in separate counts, Fed.R.Crim.P. 8(a), "it is well settled that the test for determining whether several offenses are involved is whether identical evidence will support each of them, and if any dissimilar facts must be proved, there is more than one offense." *Id.* at 393. We held that "[t]he filing of each false document would constitute a crime, and each should be alleged in a separate and distinct count of the indictment." *Id.* The Court noted that although such a duplicitous indictment can be cured by a limiting jury instruction, none was issued by the trial court and the Court therefore reversed the defendant's convictions.[14]

■ As in *Bins*, both counts of Holley's indictment allege multiple false statements. The government was required to prove dissimilar facts to show the knowing falsity of each statement. In count one, for example, the government would have had to prove that Holley knew who Mary Kam was in order to prove that he lied about her not being a Peoples employee, and the government would have had to prove that Holley had instructed his secretary to issue the letter of credit in order to prove that he lied about not having personally authorized it.[15] The falsity of the statements in count two similarly could be proven only by showing distinct facts and Holley's knowledge of them. We therefore conclude that

> material and to the defendant's knowledge false, in that when he was being deposed on December 22, 1988, [he] knew that (1) he had told Paulette Hubbard to bring the unsigned $25,000 letter of credit, which was drawn on the accounts of Peoples Savings for the benefit of Eileen Marcus, to his office to be executed, (2) that he had told his secretary, Carol Allegro, to sign the letter of credit for him using her mother's name, and (3) that he had told Ms. Allegro to give the fraudulently executed letter of credit to Paulette Hubbard."

13. Analogously to the last paragraph of the first count, the last paragraph of the second count states that:

> "[t]he above underlined declarations made under oath by the defendant [Holley] were material and to the defendant's knowledge false, in that when he was being deposed on January 10, 1989, the defendant knew (1) that no broker, agent or other person connected with the contract between Midway Development Company and Eileen Marcus had requested a sample letter of credit, (2) that he had told Paulette Hubbard to bring the unsigned $25,000 letter of credit, which was

> drawn on the accounts of Peoples Savings for the he [sic] benefit of Eileen Marcus, to his office to be executed, (3) that he had told his secretary, Carol Allegro, to sign the $25,000 letter of credit for him using her mother's name, and (4) that he had told Ms. Allegro to give the fraudulently executed $25,000 letter of credit to Paulette Hubbard."

14. *See also North*, 910 F.2d at 876; *Duncan*, 850 F.2d 1104, 1108 n. 4 ("Courts rejecting duplicity challenges to multiple-predicate counts, however, often premise their rulings on the condition that later augmented jury instructions will adequately protect the defendant against the risk of an ununanimous verdict").

15. Kam and Holley were the only two Peoples employees in its small Dallas office. Holley had hired Kam to work at Peoples in the spring of 1985, after meeting her at a restaurant where she was working as a waitress. While with Peoples, she had been to Holley's Dallas house, and had used the swimming pool there. At trial, Holley testified that not until some time after January 10, 1989, did he realize that "Mary Kam" was his secretary Carol. He maintained

Holley's indictment is duplicitous with respect to each count and accordingly turn to the district court's unanimity instruction.

The district court instructed the jury that in order "[t]o reach a verdict, all of you must agree. Your verdict must be unanimous on each count of the indictment." The court also instructed the jury as follows:

"For you to find the defendant guilty of this crime, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

(1) That the testimony was given while the Defendant was under oath in a proceeding before or ancillary to any court of the United States;

(2) That such testimony was false in one or more of the respects charged in such court proceedings; and

(3) That the Defendant knew such testimony was false when the Defendant gave it."

The court made no other reference to a unanimity requirement.

The most reasonable interpretation of the court's instruction quoted above is that each juror was *individually* required to find at least one statement in each count to have been knowingly false in order to find

Holley guilty. The instruction does not, however, require that all of the jurors concur in the knowing falsity of at least one particular statement. Holley specifically objected to the charge because it contained no such requirement. We conclude that there was a reasonable possibility that the jury was not unanimous with respect to at least one statement in each count.[16] The district court therefore erred in overruling Holley's objection and a new trial is required.

## Conclusion

We find that the deposition testimony that formed the basis of Holley's indictment was material to the proceeding pursuant to which he was deposed. We also find, however, that the district court erred in refusing to instruct the jury that it must agree unanimously as to at least one statement in each count of the indictment in order to find Holley guilty. Accordingly, Holley's conviction and sentence are reversed and the cause is remanded.

REVERSED and REMANDED.

that he never told or authorized her to sign the letter of credit. He suggested that she had likely signed the letter of credit at the direction of Lloyd Kitchens, a Peoples vice president who visited its Dallas office from time to time, had some interest in the transaction, and, according to Holley, was then dating Kam. Kam's testimony, denied by Holley, was the only direct evidence that he told her to sign the letter of credit. Holley continued to claim that someone from or for Midway had asked him for a sample letter of credit in advance. There was evidence from Midway, Marcus, Safeco, and others that no such request was ever made and that Midway had never "been stung before on a letter of credit."

**16.** We recognize that the last paragraph of each count (see notes 12 and 13 *supra* ) could be read to inferentially limit the basis on which each statement could be found to be knowingly false. The last paragraph in count one, for example, states that the underlined deposition testimony was false "in that" Holley knew that he told Hubbard to bring the letter of credit to his office to be signed and that he told Kam to sign the letter with her mother's maiden name and return it to Hubbard. The paragraph might be

read to inferentially provide that an underlined statement could be found knowingly false *only* on the basis of Holley's knowledge *as specifically alleged* in the final paragraph, and it is further possible that such an implied requirement would also require a juror who found at least one of the underlined statements to be knowingly false to find that *every* underlined statement was knowingly false. However, the final paragraph does not expressly state that Holley's knowledge as specifically alleged in that paragraph is the only basis on which the underlined statements may be found to have been knowingly false, nor is it entirely clear that such a reading would lead to the conclusion that for any of the statements to be found knowingly false all of them would have had to be so found. Nor was such a construction of the final paragraph suggested by anything in the court's instructions or the arguments of counsel. The final paragraph does not clearly prevent a juror from finding, for example, that Holley knowingly lied when he said Mary Kam was not a Peoples employee, even though that juror was not convinced that Holley told her to sign the letter of credit. We can not say that the wording of the final paragraph of each count obviated the deficiency in the charge.