IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-8632

_____

UNITED STATES OF AMERICA

Plaintiff-Appellee,

v.

ARMANDO CORREA-VENTURA

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

(November 1, 1993)

Before KING and BARKSDALE, Circuit Judges, and DUPLANTIER[*],
District Judge:

KING, Circuit Judge:

Armando Correa-Ventura ("Correa") was convicted in the court
below of several drug-related crimes, including the use of a
firearm in the commission of a drug trafficking offense. He was
sentenced to a term of imprisonment of ninety months, a fine of
$6,000.00, supervised release for five years, and the mandatory
special assessment of $150.00. Correa appeals all of the
convictions on several related theories. Finding no error, we
affirm.

_____

[*] District Judge of the Eastern District of Louisiana,
sitting by designation.

# I. Background of the Case.

As a result of information received from a confidential informant, the Austin Police Department obtained and executed a search warrant on Correa's home at approximately 9:00 p.m. on October 21, 1991.[1]  Soon after entering the residence, the officers secured Correa in a bedroom which he identified as being the one he shared with his wife.  With the assistance of a bilingual police officer, Correa cooperated in pointing out the drugs and weapons in his home.  In Correa's bedroom, the officers located approximately four ounces of cocaine, wrapped in a red towel, scales, and a Cobray M-11 9mm semiautomatic pistol under the bed.  The cocaine and pistol were approximately four to six feet apart, and the gun was not loaded.  The officers found nearly $900.00 in currency and a Browning 9mm pistol in a dresser drawer adjacent to the bed.  Finally, the police discovered a Taurus .380 pistol in a boot next to a pair of men's pants with $410.00 in currency in one of the pockets.  Both the Browning and the Taurus were loaded.

The officers also went into another bedroom occupied by Correa's daughter and son-in-law in which they discovered more cocaine and a .12 gauge Winchester short-barreled shotgun.  Correa then directed the police to his garage/storage room where

---

[1] The informant, Tomas Herrera ("Herrera"), had himself been the subject of a prior warrant search, in which the Austin Police had recovered marijuana and cocaine from the Herrera home.  Herrera told the Austin Police that he had received the drugs from Correa.  Herrera was subsequently convicted by a Texas state court of possession of marijuana and possession of cocaine with intent to deliver and was sentenced to ten years probation.

he pointed out two suitcases, one of which held more than five pounds of marijuana, and the other contained marijuana residue.

The search also yielded two long-range rifles in the living-room fireplace, two more shotguns in a rack on the living-room wall, a Spanish Fork .22 calibre rifle in the dining room, and a Marlin .22 calibre rifle behind the seat of a pickup truck located in the driveway.[2]  In all, the officers located approximately 140 grams of cocaine, 5.2 pounds of marijuana, ten firearms, and $1200.00 in currency throughout the Correa residence.

After being advised of his <u>Miranda</u>[3] rights, Correa orally assumed total responsibility for the drugs found in his bedroom and the garage area.  He admitted that he had started selling drugs about four months before the search and that he had procured these drugs for resale.  He also acknowledged ownership of the guns, but claimed they were for hunting and for protection of his automotive shop.

The next day, after having received another <u>Miranda</u> warning, Correa gave a written statement to the Austin police in which he reiterated his responsibility for the drugs and ownership of the weapons.  However, Correa maintained that the guns were for hunting, protection, and collection purposes, and claimed that one was purchased for a police officer in Mexico.

---

[2] The Marlin rifle was registered to Amalia Correa, Correa's wife.

[3] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

The Austin Police reported the results of the search and Correa's corresponding statements to Drug Enforcement Agency ("DEA") authorities who obtained a grand jury indictment against Correa for possession with intent to distribute cocaine and marijuana, both in violation of 21 U.S.C. § 841(a)(1), and for the use or carrying of a firearm in connection with these drug trafficking offenses in violation of 18 U.S.C. § 924(c) ("Section 924(c)"). Correa was arrested on November 13, 1991, by DEA officers and was taken back to the Austin Police Department Repeat Offenders Program Unit Headquarters[4] for questioning.[5] Correa again conceded that he had obtained the drugs found in the October 21 search for distribution. He claimed that he acquired the cocaine from an individual named Oscar Garcia and from a man he knew as "Jesse."

At his November 27, 1991, arraignment, Correa pled "not guilty" to all three counts of the indictment.[6] Count Three of

_____

[4] We note that Correa did not have a prior criminal history at the time of his arrest and that the involvement of the Austin Police Department Repeat Offenders Program was mere coincidence.

[5] During the interview with the DEA agents, Correa made statements to the effect that he had not sold any of the cocaine, a position contrary to the acknowledgments he had previously made to the Austin police. When this inconsistency was brought to his attention, however, Correa acknowledged the previous declarations.

[6] At trial, however, Correa did not appear to defend the drug charges, but rather focused solely upon the firearm count. In fact, Correa's attorney conceded that he was "not going to waste [the jury's] time in an argument on Count 1 [possession with intent to distribute cocaine] or Count 2 [possession with intent to distribute marijuana]. What's at stake here is whether or not [he] knowingly was using a weapon in relation to his possession in Count 1 or Count 2."

4

the indictment charged Correa with using or carrying "**a**" firearm in connection with the drug trafficking crimes charged in Counts One and Two.  Correa filed a motion to dismiss Count Three based upon (1) the failure to allege that he "knowingly" employed a firearm and (2) his perception that the government's failure to identify a particular weapon rendered the indictment fatally defective.  In response, the government filed a superseding indictment on July 16, 1992, adding an allegation that Correa "knowingly" used or carried a firearm in connection with the drug charges, and filed a Bill of Particulars listing all ten of the guns recovered as possible weapons which "the government may introduce at trial to prove [Correa's] use of a firearm."

During the trial, the government placed in evidence all ten of the weapons seized from Correa's home and identified in the government's Bill of Particulars.  The government did not identify to the jury any one of these as being the specific firearm charged in Count Three, but rather elicited testimony as to the location and condition of each of these guns, specifically demonstrating that at least four of the guns were located in close proximity either to narcotics or to admitted proceeds from drug dealing.[7]

---

[7] As discussed above, the unloaded Cobray M-11 semi-automatic was under the bed in Correa's bedroom approximately four to six feet from a sizeable amount of cocaine.  The loaded Taurus and Browning pistols were located near $1,200.00 in currency that Correa confessed to have received from drug sales. Finally, the Winchester short-barreled shotgun was found next to a container of cocaine in Correa's daughter's room.

The jury convicted Correa of all three counts after twelve minutes of deliberation. The district court sentenced him to thirty months imprisonment for each of the possession offenses charged in Counts One and Two with the sentences to run concurrently. With respect to the firearm offense, the court sentenced Correa to sixty months of imprisonment to run consecutively to the other sentences in accordance with the mandatory penalty provisions of Section 924(c). The district court additionally imposed a $6,000 fine and a five-year term of supervised release after the prison term was completed.

## II. Failure to Rearraign

In his first point of error, Correa argues that the superseding indictment, issued eleven days before trial, required rearraignment. Although this indictment was virtually identical to the original -- except that it added "knowledge" to the elements of the firearm violation alleged in Count Three -- Correa argues that he was entitled to another arraignment and that the district court's failure to hold one requires reversal.

An arraignment is required so that a defendant may be informed of the substance of the charges against him and given an opportunity to plead to them. FED. R. CRIM P. 10. The interests at issue are the defendant's right to know of the charges made and the right to have adequate information from which to prepare a defense. United States v. Rogers, 469 F.2d 1317, 1318 (5th Cir. 1972). These rights may be prejudiced by the lack of formal charge and entry of a plea until the beginning of the trial

6

proceedings. Id. However, a conviction will not be vacated for lack of formal arraignment proceedings unless possible prejudice is shown. United States v. Grote, 632 F.2d 387, 389 (5th Cir. 1980), cert. denied, 454 U.S. 819 (1981).[8]

As noted above, the record indicates that approximately two months prior to trial, Correa filed a motion to dismiss the firearm count for failure to include the required element of "knowingly" in the indictment. Eleven days before trial, the government responded to this motion by filing a superseding indictment to correct the omission. Correa was not rearraigned on the superseding indictment.

Correa argues that the lack of arraignment on the superseding indictment prejudiced his defense by forcing him to trial on the possession charges as well as on the firearm offense. He claims in his brief that he never intended to contest his guilt to the possession charges and that he was prejudiced in the eyes of the jury when he admitted his guilt to those charges at trial. However, at his prior arraignment, Correa pled "not guilty" to all three counts of the indictment. The superseding indictment did not modify the possession charges.

---

[8] Correa cites to United States v. Boruff, 909 F.2d 111 (5th Cir.), cert. denied, 111 S. Ct. 1620 (1991), for the proposition that failure to rearraign on a superseding indictment constitutes error. See Brief of Appellant at 10. It is important to note, however, that the court in Boruff specifically found that the error was not prejudicial, since the superseding indictment merely clarified certain allegations previously made. 909 F.2d at 118. Thus, the error was held to be harmless. Id. Similarly, on the record in the instant case, we hold that the error in failing to rearraign, if any, was harmless.

Moreover, there is no evidence in the record that Correa subsequently desired to plead guilty on any of these counts. The trial took place over eight months after the arraignment, and Correa never indicated any wish to plead guilty on the possession offenses. In fact, the Amended Scheduling Order entered by the lower court on June 1, 1992, made clear that Correa could have changed his mind -- and that the court would accept plea agreements -- up to and including July 23, 1992, four days before trial. There is no evidence in the record that Correa attempted to invoke this provision or otherwise to enter a guilty plea in the proceedings. Consequently, Correa has not demonstrated that he was prejudiced by the lack of formal arraignment proceedings. See Rogers, 469 F.2d at 1318. Correa's first point of error is thus overruled.

### III. Motions For Continuance

Correa next argues that the trial court erred in failing to grant his motions for continuance made after the filing of the superseding indictment and after the late disclosure of allegedly withheld discovery materials. We note that trial judges have broad discretion in deciding whether to grant continuances. United States v. Gentry, 839 F.2d 1065, 1073 (5th Cir. 1988). To prevail upon appeal, Correa must therefore demonstrate an abuse of discretion resulting in serious prejudice. United States v. Kelly, 973 F.2d 1145, 1147-48 (5th Cir. 1992). Because we find that the district court did not abuse its discretion in denying the two requests, we overrule this point of error as well.

8

Correa's first request for a continuance about which he complains[9] came after the government obtained the superseding indictment -- to cure the very defect argued by Correa in his motion to dismiss.  Correa maintained that the superseding indictment necessitated a change in defense strategy, requiring additional time to prepare.

Under the Speedy Trial Act, 18 U.S.C. § 3161 et seq., a criminal trial cannot begin less than thirty days from the date on which the defendant first appeared through counsel.  18 U.S.C. § 3161(c)(2).  A thirty-day abatement period is not required, however, for each superseding indictment once the original thirty-day period runs after the initial indictment.  E.g. United States v. Rojas-Contreras, 474 U.S. 231, 234 (1985).  However, if a superseding indictment operates to prejudice a defendant, the trial judge may grant a continuance when necessary to allow further preparation "if `the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.'"  Id. at 236 (quoting 18 U.S.C. § 3161(h)(8)).

For reasons similar to those discussed above with respect to Correa's first point of error, we cannot find that the government's attempt to cure a defect in the indictment, presumably brought to its attention by Correa's motion to dismiss, somehow prejudiced Correa.  The government informed the

---

[9] We note that this first request was for a continuance of the hearing on pretrial motions -- not of the trial itself.

9

trial court that the sole reason for the superseding indictment was to add a mens rea allegation in response to Correa's motion to dismiss.  Correa did not, and does not, dispute the government's statements in this regard.  Indeed, the very fact that he moved to dismiss, in part, on the basis that scienter was not alleged, tells us that he was quite conscious of the crime's required elements.  Further, the addition of the term "knowingly" hardly changed the nature of the crimes charged against Correa.  Thus, we find that Correa has failed to demonstrate any prejudice suffered as a result of the change in the superseding indictment.

Correa also argues that he was entitled to a continuance on the basis of certain Brady[10] material that he allegedly failed to receive until the day of trial.  Specifically, Correa alleges that he did not discover the existence of a tape recording of a telephone conversation he had with an informant until the first day of his trial.  The late discovery of this evidence, he concludes, warranted a continuance of the trial.

The record shows that Correa learned of the tape recording from the informant, Tomas Herrera ("Herrera"), the weekend before the trial as he prepared Herrera to testify.  Correa filed an emergency motion for the production of any Brady materials, and the government acknowledged at the hearing that the tape recording of the conversation between Correa and Herrera was in its possession.  The government argued, however, that the tape had been previously produced to Correa's prior counsel and that

_____

[10] Brady v. Maryland, 373 U.S. 83 (1963).

it had made all of the evidence available to Correa's substituted trial counsel. Correa's trial attorney did not, however, take advantage of the government's offer to inspect the materials which had been previously produced to his first counsel. The district court nonetheless allowed a brief recess before the jury was selected so that Correa's counsel could review the tape recording. Correa's trial counsel conceded, after a full opportunity to hear the tape, that it did not contain <u>Brady</u> material. Since the tape recording was not put into evidence for our review, we must assume this admission to be correct. As such, we cannot find that the district court abused its discretion in denying the trial continuance on that basis. Correa's second point of error is thus overruled.

## IV. The Jury Charge

In his third and final point of error, Correa complains that the district court erroneously omitted his requested instruction on unanimity from the jury charge. As noted previously, Correa was charged in Count Three of the indictment with using or carrying "**a**" firearm in connection with one of the predicate drug offenses. The court charged the jury generally to render a unanimous verdict on each count of the indictment. With respect to Count Three regarding firearms, counsel for Correa had tendered an instruction additionally requiring the members of the jury to agree as to which gun in particular they believed was used to commit the offense. Specifically, defense counsel had requested that the jury be instructed as follows:

11

> In order to find the defendant guilty of Count Three you must unanimously agree on which weapon the defendant used or carried in connection with the crime charged in Count One or Count Two.

The district court denied this request and overruled defense counsel's objection to its omission in the charge. Instead, the court instructed the jury in pertinent part as follows:

> For you to find the Defendant guilty of this crime, you must be convinced that the Government has proved each of the following beyond a reasonable doubt: First, that the Defendant committed the crimes alleged in Counts One or Two . . . and [s]econd, that the Defendant knowingly used or carried a firearm during and in relation to the Defendant's commission of the crimes alleged in Counts One or Two.

> You are instructed that possession alone of a firearm is not sufficient to find the Defendant guilty of Count Three. You must be convinced beyond a reasonable doubt that **at least one** of the firearms in evidence played a role in or facilitated, or had the potential of facilitating, the commission of a drug offense. In other words, you must find that **at least one** of the firearms was an integral part of the drug offense charged . . . .

(emphasis added).

## A.   Standard of Review

Since defense counsel properly preserved error on this point, we review the charge omission for abuse of discretion. United States v. Pineda-Ortuno, 952 F.2d 98, 105 (5th Cir.), cert. denied, ___ U.S. ___, 112 S. Ct. 1990 (1992). The starting point in our analysis is that a trial court is afforded great latitude in determining what instructions are merited by the evidence presented. United States v. Rochester, 898 F.2d 971, 978 (5th Cir. 1990). Counterbalancing this presumption, however, is the defendant's need to have the jury instructed as to

12

potentially exculpating particulars of his defense which could ultimately affect its verdict.  United States v. Rubio, 834 F.2d 442, 447 (5th Cir. 1987).  Accordingly, where the district court "refuse[s] a charge on a defense theory for which there is an evidentiary foundation and which, if believed by the jury, would be legally sufficient to render the accused innocent," this court presumes that the lower court has abused its discretion.  Rubio, 834 F.2d at 446 (quoting United States v. Lewis, 592 F.2d 1282, 1285 (5th Cir. 1979)).  This Circuit has developed a tripartite test for determining reversible error when the trial court refuses a defense-tendered instruction:

> (1)  The instruction is substantially correct;
>
> (2)  The requested issue is not substantially covered in the charge actually given to the jury; and
>
> (3)  The instruction "concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense."

United States v. Grissom, 645 F.2d 461, 464 (5th Cir. 1981).  See also U.S. v. Daniel, 957 F.2d 162, 170 (5th Cir. 1992).  We note, as a preliminary matter, that these conditions are worded in the conjunctive; in other words, all three prongs of the test must be met to obtain a reversal of the district court's refusal to give the specific unanimity instruction.  Rochester, 898 F.2d at 978.

Under the facts of this case, the first prong of the Grissom test is the most critical.  If Correa is correct in asserting that his proposed specific unanimity instruction is a "substantially correct statement of the law," then we would be

13

hard pressed to find that it was covered by the general unanimity instruction elsewhere in the charge. Further, we cannot reach the third branch of the inquiry unless Correa's instruction is in fact legally accurate.

**B.    History of the Unanimity Rule**

To determine whether Correa's proposed instruction that all twelve jurors agree as to the particular firearm "used" or "carried" is an accurate reflection of the law, we must first review the constitutional underpinnings of the "unanimous verdict" requirement. It has long been the position of the United States Supreme Court that "unanimity is one of the indispensable features of a federal jury trial." Johnson v. Louisiana, 406 U.S. 356, 369-70 (Powell, J., concurring) (emphasis and citations omitted). See also Andres v. United States, 333 U.S. 740, 748-49 (1948).

The source of this right to a unanimous verdict is derived from historical common law practice both in England and the colonies. Id. at 370-71 & nn.6&7. Although the right does not specifically originate in the Constitution, it was recognized at common law as a means of insuring that the government has met its burden of proving all facts necessary to show the defendant's guilt. E.g., 4 WILLIAM BLACKSTONE, COMMENTARIES *343-44. See also Johnson, 406 U.S. at 370-71 (Powell, J., concurring). As the Supreme Court has noted, "[t]he origins of the unanimity rule are shrouded in obscurity." Apodaca v. Oregon, 406 U.S. 404, 407 n.1 (1972). However, by the Eighteenth Century, the right to a

14

unanimous verdict was well-established.  3 WILLIAM BLACKSTONE,

COMMENTARIES *379-80.

The unanimity rule is a corollary to the reasonable-doubt

standard, both conceived as a means of guaranteeing that each of

the jurors "reach[] a subjective state of certitude" with respect

to a criminal defendant's culpability before rendering a

conviction.  In re Winship, 397 U.S. 358, 364 (1970).  In

Winship, the Supreme Court had held that proof beyond a

reasonable doubt of each element of the crime charged was

constitutionally required in order for a conviction to stand.

The Winship Court noted:

> "Due process commands that no man shall lose his
> liberty unless the Government has borne the burden of
> . . . convincing the factfinder of his guilt."  To this
> end, the reasonable-doubt standard is indispensable,
> for it "impresses on the trier of fact the necessity of
> reaching a subjective state of certitude of the facts
> in issue."

Id. (quoting Speiser v. Randall, 357 U.S. 513, 525-26 (1958), and

Dorsen & Rezneck, In re Gault and the Future of Juvenile Law, 1

FAMILY LAW QUARTERLY, No. 4, pp. 1, 26 (1967)).  The requirement

that all twelve jurors be in agreement as to a defendant's guilt

is employed to give substance to the reasonable-doubt standard;

if a verdict is less than unanimous, the dissension tends to show

that a reasonable doubt exists as to the criminal activity

charged.[11]  Scott W. Howe, Jury Fact-Finding in Criminal Cases:

---

[11] There appears to be some question as to whether the unanimity requirement is derived from the Sixth Amendment right to trial by jury or from the due process clauses of the Fifth and Fourteenth Amendments.  In his concurrence in Johnson v. Louisiana, Justice Powell maintained that the source of the

requirement is in the Sixth Amendment, which adopted the procedural protections known at common law into the requirement of trial by jury. 406 U.S. 356, 371 (1972) ("The reasoning that runs throughout this Court's Sixth Amendment precedents is that, in amending the Constitution to guarantee the right to jury trial, the framers desired to preserve the jury safeguard as it was known to them at common law."). However, he recognized that the due process clause of the Fourteenth Amendment did not require the states to "apply the federal jury-trial right with all its gloss." Id. Justice Douglas, in his dissent in Johnson, also reasoned that the right was derived from the Sixth Amendment. 406 U.S. at 383. See also United States v. Gipson, 553 F.2d 453, 456 (5th Cir. 1977) (FED. R. CRIM. P. 31(A) codifies "a requirement that the Supreme Court has long assumed to inhere in a federal criminal defendant's sixth amendment right to a trial by jury."); United States v. Beros, 833 F.2d 455, 462 (3d Cir. 1987); Andres v. United States, 333 U.S. 740, 748 (1948) (Sixth Amendment guarantees a right to a unanimous jury verdict in federal criminal trials).

Conversely, the plurality in Apodaca v. Oregon, 407 U.S. 404, 412 (1972) -- decided the same day as Johnson -- stated that the unanimity rule was based upon the reasonable-doubt standard, which was "rooted, in effect, in due process." Further, the Johnson Court recited that the Supreme Court "has never held jury unanimity to be a requisite of due process of law," 406 U.S. at 359, thus implying that it has some relationship to due process. Nonetheless, whether unanimity was derived from the Fifth Amendment -- as the plurality in Apodaca seemed to believe -- or was simply a "judicial gloss" on the Sixth Amendment -- as Justices Powell and Douglas and other precedents indicate -- it was not considered to be grounded deeply enough in the Constitution to require its imposition upon the fifty states through the Fourteenth Amendment. Apodaca, 407 U.S. at 412; Johnson, 406 U.S. at 363.

More recently, the Supreme Court has apparently agreed that the requirement of jury consensus as to a defendant's course of action "is more accurately characterized as a due process right than as one under the Sixth Amendment." Schad v. Arizona, ___ U.S. ___, 111 S. Ct. 2491, 2498 n.5 (1991) (plurality opinion of Souter, J.); id. at 2506-07 (Scalia, J., concurring); and id. at 2508 (White, J., dissenting)). See also Scott W. Howe, Jury Fact-Finding in Criminal Cases: Constitutional Limits on Factual Disagreements Between Convicting Jurors, 58 Mo. L. REV. 1, 8-9 n.36 (1993) (In Schad, the "Supreme Court unanimously agreed that the factual concurrence mandate stems, not from the Sixth Amendment, but from the residual protections of due process.").

<u>Jurors</u>, 58 Mo. L. Rev. 1, 12 (1993).

In order to remove any doubt as to whether a federal criminal trial necessitated a unanimous verdict, Federal Rule of Criminal Procedure 31(a) codified existing case-law as discussed above.  <u>See</u> Fed. R. Crim. P. 31(a) & advisory committee comment. <u>See also</u> <u>United States v. Gipson</u>, 553 F.2d 453, 456 & n.3 (5th Cir. 1977).

**C.    The Reach of Required Consensus**

Having determined that a total consensus verdict is required in federal criminal cases does not, however, end the inquiry. The difficulty in the mandate of unanimity lies in ascribing the appropriate definition of a "unanimous verdict" to situations in which differing factual theories have been presented in support of the same ultimate issue.  We note that there are two levels of unanimity necessarily involved in this question:  unanimity as to verdict and unanimity as to the critical facts necessary to support that verdict.  The unanimous verdict guaranteed by Federal Rule of Criminal Procedure 31 does not necessarily insure that all twelve -- or in some cases, even a majority -- concurred in the factual basis for liability.  As will be discussed in greater detail below, some sort of factual concurrence is required by due process concerns.  <u>Gipson</u>, 553 F.2d at 458 ("Requiring twelve jurors to convict a defendant does little to insure that his right to a unanimous verdict is protected unless this prerequisite of jury consensus as to the defendant's course of action is also required.").  Courts have repeatedly struggled

17

with some way to define which facts warrant total consensus and which may be subject to disagreement without threatening the integrity of the guilty verdict. Compare Andres, 333 U.S. at 748 ("In criminal cases this requirement of unanimity extends to all issues -- character or degree of the crime, guilt and punishment -- which are left to the jury."), with United States v. Bouquett, 820 F.2d 165, 169 (6th Cir. 1987) ("[T]his court does not require jurors to agree unanimously as to a theory of guilt where a single generic offense may be committed by a variety of acts.") and Holland v. State, 91 Wis.2d 134, 280 N.W.2d 288, 292-3 (1979) (Jury consensus is required "only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged . . . ."), cert. denied, 445 U.S. 931 (1980). On the one hand, "[u]nanimity . . . means more than a conclusory agreement that the defendant has violated the statute in question; there is a requirement of substantial agreement as to the principle factual elements underlying a specified offense." United States v. Ferris, 719 F.2d 1405, 1407 (9th Cir. 1983). See also United States v. Beros, 833 F.2d 455, 462 (3d Cir. 1987) ("Conviction by a jury that was not unanimous as to the defendant's specific illegal action is no more justifiable than is a conviction by a jury that is not unanimous on the specific count."). On the other hand, the courts recognize the concern that demanding total factual concurrence on each detail of the crime's commission is not warranted and will make it impossible for the government to obtain a conviction. Chicago & Northwestern Ry v. Dunleavy, 129

18

Ill. 132, 22 N.E. 15, 17-18 (1889) ("To require unanimity, not only in [the jurors'] conclusions, but in the mode by which those conclusions are arrived at, would in most cases involve an impossibility . . . [and] would be practically destructive of the entire system of jury trials.").  The Supreme Court has repeatedly recognized that "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line.  Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict."  McKoy v. North Carolina, 494 U.S. 433, 449 (1990) (Blackmun, J. concurring).

In sum, juror disagreement as to the critical facts of the offense might reflect a "reasonable doubt" that the defendant actually engaged in criminal activity.  The duty of the court is to determine which "fact[s] [are] necessary to constitute the crime," Winship, 397 U.S. at 364, and to require consensus on these "facts."  Essentially, the inquiry is how much disagreement between individual jurors as to the factual predicate for an offense can be tolerated without undermining the integrity of the guilty verdict.

D.     **United States v. Gipson and the "Distinct Conceptual Groupings" Test**

Correa argues that this court's precedent in Gipson mandates reversal of the district court's exclusion of his unanimity instruction.  In Gipson, this court was confronted with the construction of a statute which criminalized any of six proscribed acts -- "receiving, concealing, storing, bartering,

19

selling, or disposing" -- involving a stolen vehicle moving in interstate commerce. 553 F.2d at 458. Evidence was introduced at trial that the defendant had engaged in each of the prohibited acts. Id. at 455. Since all six alternatives were given to the jury in a single count, the jurors requested guidance as to whether they must agree on one of the acts in particular before a conviction could be returned. Id. at 455-56. In response, the trial court specifically instructed the jury as follows:

> A third question that may be the one the jury is really asking is, must there be an agreement by all twelve jurors as to which act of those several charged in Count Two, that the defendant did . . . . If all twelve agreed that he had done some one of those acts, but there was not agreement that he had done the same act, would that support a conviction? The answer is yes.

Id. at 456. Not surprisingly, the jury convicted Gipson of this count when it resumed deliberations. This court reversed, holding that it was impermissible to submit such disparate theories in one count and to instruct the jurors that they need not agree on which act the defendant had committed in violation of the statute. Id. at 458-59. Instead, the trial court should have split the acts into "distinct conceptual groupings" to preserve the defendant's right to a unanimous verdict. Id.[12] This Circuit considered it impermissible to fold together the two groupings into one charge question since they were "sufficiently different" that the jury may have been "permitted to convict

---

[12] Judge Wisdom, writing for the court, stated that "[t]hese six acts fall into two distinct conceptual groupings; the first consisting of receiving, concealing, and storing, and the second comprised of bartering, selling, and disposing." United States v. Gipson, 553 F.2d 453, 458 (5th Cir. 1977).

20

Gipson even though there may have been significant disagreement among the jurors as to what he did." Id. However, within each of these groupings, "the acts are sufficiently analogous to permit a jury finding of the actus reus of the offense to be deemed `unanimous' despite differences among jurors as to which of the intragroup acts the defendant committed." Id. at 458. The "conceptual groupings" test, as it came to be known, was adopted in several jurisdictions. E.g., United States v. Duncan, 850 F.2d 1104, 1113 (6th Cir. 1988), cert. denied sub nom. Downing v. United States, 493 U.S. 1025 (1990); United States v. Peterson, 768 F.2d 64, 66-7 (2d Cir.), cert. denied, 474 U.S. 923 (1985).

The Supreme Court has recently criticized the Gipson rationale when it interpreted the unanimity requirement in the context of the Arizona first-degree murder statute. See Schad v. Arizona, ___ U.S. ___, 111 S. Ct. 2491, 2494 (1991). The government implies that Schad has drained Gipson of its vitality. Brief of Appellee at p. 23. Schad involved a constitutional attack upon Arizona's first-degree murder statute which allows for conviction either for premeditated murder or for felony murder. Justice Souter, writing for the plurality, framed the issue as one of what limits may be imposed upon a state in defining alternative means to commission of a criminal action. 111 S. Ct. at 2496. Specifically, the Court was to determine whether Arizona could, in accordance with the federal Constitution, define premeditated murder and felony murder as

21

alternative means to satisfy the mens rea element of first degree murder. Id. Asserting that there was "no reason . . . why the rule that the jury need not agree as to mere means of satisfying the actus reus element of an offense[13] should not apply equally to alternative means of satisfying the element of mens rea," 111 S. Ct. at 2497, the plurality advocated a new approach to defining the permissible limits for statutory alternatives. Id. at 2500. In doing so, Justice Souter rejected the Gipson "distinct conceptual groupings" test as being "too indeterminate to provide concrete guidance to courts faced with verdict specificity questions." 111 S. Ct. at 2498. According to the plurality, instead of "deriv[ing] any single test for the level of definitional and verdict specificity permitted by the Constitution," the court should instead focus upon "a distillate of the concept of due process with its demands for fundamental fairness . . . and for the rationality that is an essential component of that fairness." Id. In applying this fairness and rationality approach in a given case, Justice Souter counseled

---

[13] The plurality cites only to Justice Blackmun's concurrence in McKoy v. North Carolina, 494 U.S. 433, 449 (1990), in support of its conclusion that there exists a "rule that the jury need not agree as to mere means of satisfying the actus reus element of an offense . . . ." 111 S. Ct. at 2497. In McKoy, Justice Blackmun reflected that "there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." 494 U.S. at 449. However, in a footnote, Justice Blackmun makes clear that, where unanimous verdicts are required -- such as in federal criminal prosecutions -- "`there is a requirement of substantial agreement as to the principal factual elements underlying a specified offense.'" McKoy, 494 S. Ct. at 449 n.5. (quoting United States v. Ferris, 719 F.2d 1405, 1407 (9th Cir. 1983)).

22

that the court must "look both to history and wide practice as guides to fundamental values, as well as to narrower analytical methods of testing the moral and practical equivalence of the different mental states that may satisfy the mens rea element of a single offense."  Id.[14]  The plurality then concluded that equating premeditation and felonious intent as comparably culpable mental states "finds substantial historical and contemporary echoes," and is therefore permissible.   Id. at 2501.[15]

E.    **United States v. Holley and the "Multiple Offenses" Approach**

Contrary to the arguments of both Correa and the government, we do not find either Schad or Gipson to control the outcome of this case.  Both involved statutes where the respective legislatures had set forth particular alternatives for satisfying a given element of a statutorily defined crime.  The specific issue in both was whether differences between jurors as to which of the statutorily enumerated means was used to commit the same

---

[14] It is important to note that this analysis was undertaken with a "threshold presumption of legislative competence to determine the appropriate relationship between means and ends in defining the elements of a crime."  Schad, 111 S. Ct. at 2500.

[15] Justice Scalia joined only in the judgment of the Court under his view that Arizona's statutory scheme for defining first-degree murder was so historically-ingrained that it was beyond fundamental fairness review.  111 S. Ct. at 2507. However, but for the fact that defining first-degree murder in such a fashion was so settled in this country, he argued that he might well have gone with the dissent.  Id. (Scalia, J., concurring).

23

crime were Constitutionally permissible.[16]  This case, by contrast, does not present an election between statutory means; instead, the issue is one of pure unanimity.[17]  We are not faced with statutory alternatives to meeting a given element of a 924(c) offense, but rather whether the firearm component of the crime requires factual concurrence.  This court, in United States v. Holley, 942 F.2d 916 (5th Cir. 1991), appropriately

---

[16] Schad is a difficult decision for this court for several reasons, not the least of which is that it is a plurality decision which fails to reconcile two quite divergent analyses to obtain a majority result.  Schad is additionally troublesome in application to the facts presented because it involved review of the state court of Arizona's interpretation of its own murder statute and was evaluated only for error of constitutional magnitude.  Further, as discussed above, the Supreme Court was evaluating the propriety of equating alternative statutory mens rea to determine whether they were sufficiently interchangeable to support a permissible patchwork verdict.  In contrast, we are presented in the instant case with an interpretation of a federal statute in the first instance to determine whether federal law requires a specific consensus as to the historical facts supporting one particular element of the crime.  Thus, to the extent that Schad counsels us to look to any common law predecessor of the firearm statute or to interpretations of similar laws in other jurisdictions or to "moral equivalence" balancing tests, it simply has no application here.

Nonetheless, to the extent the combination of views in Schad sheds light upon the proper interpretation of an unanimity requirement with respect to a criminal statute generally, we attempt to employ its rationale.  We read Schad's broader message to be that, in evaluating the level of generality necessitating agreement, one must first look to the general history of the statute.  In the instant case, the legislative history of Section 924(c) and federal case-law interpreting the statute are thus the relevant concerns.

[17] As the Schad plurality itself noted, "[t]he issue . . . then is one of the permissible limits in defining criminal conduct, as reflected in the instructions to jurors applying the definitions, **not** one of jury unanimity."  Schad, 111 S. Ct. at 2496 (emphasis added).

24

distinguished Schad from a pure unanimity situation similar to the one presented as follows:

> In Schad, there was a single killing of one individual, and Justice Souter, stressing that under Arizona law first degree murder was "a single crime," concluded that there was no more need for jury unanimity as to alternative mental states, each satisfying the mens rea element of the offense, than there was for the jurors to all agree on the precise means employed to cause death. **This differs, however, from the situation where a single count, as submitted to the jury embraces two or more separate offenses, though each be a violation of the same statute**.

942 F.2d at 927 (emphasis added). In other words, Schad involved alternative statutory means for committing one offense; Holley, on the other hand, involved distinct instances of the same crime which could have resulted in potentially multiple convictions.

In Holley, the defendant was convicted of two counts of perjury in connection with his deposition testimony in an adversary personal bankruptcy proceeding. For each count, however, the indictment alleged multiple statements, each of which would have constituted a separate violation of the perjury statute. Id. at 927-28. Cf. Bins v. United States, 331 F.2d 390, 393 (5th Cir.), cert. denied, 379 U.S. 880 (1964) (where false statements made on two separate loan applications, filing of each false document would constitute a separate crime). The trial court rejected a jury instruction to the effect that the jury must be unanimous as to at least one statement in each count. Holley, 942 F.2d at 922. This court held that the counts alleging multiple instances of perjury were in fact, separate

25

offenses, and consequently the indictment was duplicitous.[18]  Id.
at 928-29.  To cure the duplicity, the district court was
required to give the jury Holley's tendered instruction on
specific unanimity.  Id. at 929.  Its failure to do so was
reversible error.  Id.

Holley would appear to counsel that unanimity is closely
related to the issue of duplicity -- i.e., that a specific
unanimity instruction may be required where two separate
"offenses" are included in the same count.  Accord United States
v. Baytank, Inc., 934 F.2d 599, 690-10 (5th Cir. 1991)
(suggesting that unanimity may be at issue only if the count is
duplicitous).  It is true that the concern under either
procedural posture is the same -- the jury should not be
permitted to evaluate separate and distinct offenses about which
they may disagree in rendering a patchwork guilty verdict:

> The vice of duplicity is that there is no way in which
> the jury can convict of one offense and acquit of
> another offense contained in the same count.  A general
> verdict of guilty will not reveal whether the jury
> found the defendant guilty of one crime and not guilty
> of the others, or guilty of all.  It is conceivable
> that this could prejudice [the] defendant in
> sentencing, in obtaining appellate review, and in
> protecting himself against double jeopardy.

---

[18] Duplicity has been defined as follows: "[I]f the statute
is read as creating a single offense involving a multiplicity of
ways and means of action and procedure, the charge can be laid in
a single count . . . . But if the statute includes several
offenses, to charge them in a single count would be duplicitous."
1 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 2D § 142 at
470-72 (1982) (citations omitted).  Thus, the focus of the
duplicity inquiry is whether distinct and separate "offenses" are
alleged in one count.  Id.

1 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 2D § 142 at 475 (1982) (citations omitted).

Although the cases analyzing duplicity may be helpful, defining unanimity in terms of "separate offenses" or "separate crimes" would result in an unworkable "brightline" test. Moreover, the issues of duplicity and unanimity are evaluated at different procedural stages of the criminal proceedings -- duplicity is generally reviewed during the pretrial phase, whereas unanimity must be determined after all the evidence has been introduced at trial. For this reason, the inquiry as to whether offenses are distinct for purposes of duplicity is not identical to the analysis employed in determining whether the actions charged are so dissimilar that unanimity is required. As this court noted in Holley, "[c]ourts rejecting duplicity challenges to multiple-predicate counts often premise their rulings on the condition that later augmented jury instructions will adequately protect the defendant against the risk of an ununanimous verdict." Id. at 928 n.14 (quoting Duncan, 850 F.2d at 1108 n.4). Nonetheless, mindful of these distinctions, we find the cases involving duplicity to be somewhat instructive for determining whether factual concurrence is required in a given case.

F.   The Approach for this Case

We conclude that factual concurrence must be viewed on a case-by-case basis to address the concerns discussed above and to

insure that the purposes of unanimity are satisfied.[19]  "[S]ince
the set of material issues changes composition with the facts of
each case, precedents cannot necessarily be used to construct a
clear definition of materiality."  Note, Right to Jury Unanimity
on Material Fact Issues:  United States v. Gipson, 91 HARV. L.
REV. 499, 502 & n.27 (1977).  Statutory language and
construction, legislative intent, historical treatment of the
crime by the courts, duplicity concerns with respect to defining
the offense, and the likelihood of jury confusion in light of the
specific facts presented are all necessary inquiries to be
addressed before a trial judge can ascertain whether he must
instruct the jury to concur in predicate facts as well as in
result.  In making these determinations, the court must consider
exactly what conduct the statute is designed to punish and deter.
United States v. Jackson, 879 F.2d 85, 88 (3d Cir. 1989).  The
Jackson court, in construing the federal continuing criminal
enterprise ("CCE") statute, 21 U.S.C. § 848, aptly recognized a
distinction between those issues necessitating unanimity and
those issues upon which the jury need not agree:

> While the jury must reach a consensus on the fact that
> there were five or more underlings, which is an
> essential element of the CCE offense, there is no
> logical reason why there must be unanimity on the
> identities of these underlings.  Unlike the three
> offenses necessary to constitute a series, which is the

---

[19] The Supreme Court has recognized that such inquiries must
be made based upon the specific facts in a given case.  See
Griffin v. United States, ___ U.S. ___, 112 S. Ct. 466, 468
(1991) (Scalia, J.) ("The question presented for review . . . is
simply whether a general verdict of guilty **under circumstances
such as existed here** `is reversible.'") (emphasis added).

28

conduct which the CCE statute is designed to punish and deter,[20] the identity of these underlings is peripheral to the statute's other primary concern, which is the defendant's exercise of the requisite degree of supervisory authority over a sizeable enterprise.

Id. at 88-89.  See also United States v. Linn, 889 F.2d 1369, 1374 (5th Cir. 1989), cert. denied, ___ U.S. ___, 111 S. Ct. 43 (1990).  Although recognizing that the approach we advance today does not yield any brightline tests for making such determinations, we note that the dictates of due process do not often lend themselves to easy application.  Against this backdrop, we turn to the case presented.

**G.   Section 924(c)**

As noted above, Correa was charged with one violation of Section 924(c), and the government introduced evidence of ten different firearms which could have been used to commit the offense.  Section 924(c) provides that:

Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years . . . .

---

[20] In addition to the offense at issue in Jackson, which required that the defendant supervise five or more persons in the context of a criminal enterprise, the CCE statute also allows conviction upon proof that the defendant engaged in a "series" of three related predicate crimes.  See generally 21 U.S.C. § 848. In United States v. Echeverri, the Third Circuit had previously determined that jury consensus was necessary for each of the three offenses in the series.  854 F.2d 638, 643 (3d Cir. 1988).

29

18 U.S.C. 924(c).  In light of the unanimity concerns addressed above, the issue in the instant case should be framed as follows: If some jurors believe that one gun was used to commit the Section 924(c) offense, and others believe another gun was used, does that disagreement evidence a reasonable doubt that Correa used a firearm in committing a drug trafficking crime?  The facts of this case do not appear to warrant a reasonable doubt.[21]

### 1.  Wording of the Statute

In accordance with the approach set forth above, we first turn to the plain language of the statute.  The mere carrying or use of a firearm is not the criminal <u>actus</u> <u>reus</u> proscribed -- rather it is the employment of the weapon in the context of

---

[21] The following hypothetical of Professor Howe may be helpful in this regard:

> Suppose that a defendant named Barnes is charged with an assault against a person on Tuesday.  One witness saw the incident and thought that Barnes struck the complainant on the side of the head with the butt of a dark-colored pistol.  Another witness testifies that she saw Barnes strike the complainant on the side of the head with a blackjack, not a pistol.  No more than seven jurors agree upon the weapon employed.  Nonetheless, all of the jurors agree that Barnes committed an act of assault on the complainant, although they do not agree precisely on the nature of that act.  Is conviction for assault proper here?  Surely it is.  Here, the disagreement among jurors concerns a detail so trivial that it creates no doubt that Barnes engaged in conduct proscribed by the relevant statute.

Scott W. Howe, <u>supra</u> note 11 at 23-4.  Although we recognize that this example is not identical to the facts of the instant case, it provides another useful way to view the issue presented -- whether the identity of the individual firearm or firearms used is "a detail so trivial that it creates no doubt that [Correa] engaged in the conduct proscribed by [Section 924(c)]."  <u>Id.</u>

another predefined crime.  18 U.S.C. § 924(c)(1).  The fact that the firearm offense is conditioned upon proof beyond a reasonable doubt of an underlying crime is indicative of legislative intent. Indeed, Section 924(c)'s dependence upon the basic felony contributes to the appearance that it is akin to a penalty enhancement provision.[22]  The contingent nature of the offense as defined demonstrates that the focal point -- or "essence" -- of the offense was that a criminal defendant used a firearm in committing another federal crime.  Accordingly, the plain language of the statute does not imply a requirement of unanimity as to the particular firearm employed.

## 2.  Legislative History

It is also appropriate to seek guidance from the legislative history of Section 924(c), since there is no common law predecessor to the statute.[23]  In doing so, we are mindful of the

---

[22] However, in different contexts, the federal courts have made clear that a Section 924(c) violation **is** a separate crime and **not** merely an enhancement provision.  See United States v. Munoz-Fabela, 896 F.2d 908, 909 (5th Cir.) (conviction of predicate crime not necessary to sustain 924(c) conviction), cert. denied, ___ U.S. ___, 111 S. Ct. 76 (1990); United States v. Wilson, 884 F.2d 174, 176 n.2 (5th Cir. 1989) (defendant need not even be charged with underlying crime); United States v. Hill, 971 F.2d 1461, 1467 (10th Cir. 1992) (en banc) (Conviction for conspiring to violate 924(c) is proper since 924(c) is a separate federal offense sufficient to support conspiracy.). Nonetheless, it is contingent upon the establishment of a predicate crime and has the effect of a sentencing enhancement since the mandatory penalties in the statute require that sentencing run consecutively with the sentence for the underlying crime.  18 U.S.C. § 924(c).  From this scheme, we can discern an intent that the use of any firearm in connection with the classified predicate crimes be punished.

[23] As the plurality in Schad acknowledged, statutory crimes are treated differently from those recognized at common law:

Supreme Court's caution that "[d]ecisions about what `fact[s]

[are] necessary to constitute the crime' and therefore must be

proven individually, and what facts are mere means, represent

value choices more appropriately made in the first instance by

the legislature than by a court."  Schad, 111 S. Ct. at 2500.

Although the very limited materials available at the time of

Section 924(c)'s enactment do not provide much guidance, see

Busic v. United States, 446 U.S. 398, 405 (1980), we are

persuaded that the focus of Congress in enacting Section 924(c)

was upon maximum deterrence against using firearms in connection

with another crime.  See id. at 404 n.9.  In proposing the

legislation, its sponsor, Representative Poff, stated that a

primary objective of the provision was to "persuade the man who

is tempted to commit a Federal felony to leave his gun at home."

114 Cong. Rec. 22231 (1968).  Congress enacted Section 924(c) as

part of the Gun Control Act of 1968, Pub. L. 90-618, 82 Stat.

1213, in the wake of the assassinations of Martin Luther King and

Robert Kennedy, as part of a comprehensive response to the

"increasing rate of crime and lawlessness and the growing use of

firearms in violent crime."  H. R. Rep. No. 1577, 90th Cong., 2d

Sess. 7 (1968).  Although at the time of the enactment there

---

> We note, however, the perhaps obvious proposition that
> history will be less useful as a yardstick in cases
> dealing with modern statutory offenses lacking clear
> common law roots . . . .

Schad, supra, at 2501 n.7.  Because the legislative history
behind a "modern statutory crime" is similar in this respect to
the "roots" of a common law offense, it would be appropriate for
consideration.

already existed statutorily-enhanced penalties for the use of

deadly weapons in the commission of certain crimes -- e.g., armed

assault on federal officers, 18 U.S.C. § 111, or armed robbery

under 18 U.S.C. § 2113 -- this statute extended an mandatory

enhanced penalty to any situation where a defendant used a

firearm in the commission of a federal felony.[24]

The history of subsequent amendments to the statute is also

of certain value in this inquiry. See United States v. Wilson,

884 F.2d 174, 178 n.7 (5th Cir. 1989) ("[A] later Congress'

understanding of the legislative intent of an earlier Congress is

entitled to deference.").  One of the earlier amendments --

requiring that the "use[] or carry[ing]" of the firearm be

"during and in relation to" the predicate crime -- was made in

response to concerns that persons who lawfully carried a

concealed weapon could be liable for an enhanced penalty even

though the firearm was completely unrelated to the underlying

offense.[25]  In amending the statute to address this concern,

---

[24] The original version of Section 924(c) prohibited the use
of firearms during the commission of a federal felony.  See Gun
Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213.  Since that
time, the statute has been amended several times to enlarge its
reach beyond "felon[ies]" to "any crime of violence or drug
trafficking crime."  Comprehensive Crime Control Act of 1984,
Pub. L. 98-473, § 1005, 98 Stat. 1837, 2138 (changing "felony" to
"crime of violence"); Firearm Owners' Protection Act, Pub. L. No.
99-308, § 104, 100 Stat. 449, 457 (1986) (adding "drug
trafficking crime" to "crime of violence").

[25] Comprehensive Crime Control Act of 1984, supra note 24,
98 Stat. at 2138-39.  The legislative history indicates that this
qualifier was the product of a compromise when Congress deleted
the former limitation that the use or carrying of the firearm be
"unlawful."  It was employed to allay the fears of certain
members of Congress who were concerned that the deletion of the

33

Congress reiterated that the Section 924(c) penalty was inextricably intertwined with the underlying offense.

Moreover, a common thread throughout the amendments to Section 924(c) is the consistent increase in deterrence value. For example, in response to Supreme Court decisions holding that a Section 924(c) penalty could not be layered onto a predicate statute containing its own enhancement provision,[26] Congress amended the statute to make clear its intent that the defendant be sentenced under both enhancement schemes, thus maximizing the punishment.[27]  The remainder of substantive changes to the statute have similarly increased the severity of the punishment: (1) requiring that the mandatory sentence run consecutively

---

"unlawful use" requirement would potentially subject persons lawfully carrying concealed weapons to double punishment -- even where the weapon was not shown or referenced.  S. Rep. 98-225, 98th Cong. 2d Sess. 314 n.10 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3492.  "The requirement that the firearm's use or possession be `in relation to' the crime would preclude [Section 924(c)'s] application in a situation where its presence played no part in the crime, such as a gun carried in a pocket and never displayed or referred to in the course of a pugilistic barroom fight."  Id.  Congress subsequently rejected a more pro-defendant requirement that the firearm be carried "in furtherance of any such crime of violence" -- as opposed to "during and in relation to" -- as "unnecessary to prevent injustice."  H. R. Rep. 99-495, 99th Cong., 2d Sess. 9 (1986), reprinted in 1986 U.S.C.C.A.N. 1327, 1335.

[26] Simpson v. United States, 435 U.S. 6, 16 (1978); Busic v. United States, 446 U.S. 398, 404 (1980).

[27] Comprehensive Crime Control Act of 1984, supra note 24, 98 Stat. at 2138-39.  See also S. Rep. 98-225 at 312-15, reprinted in 1984 U.S.C.C.A.N. at 3490-92.  In fact, the Senate Report reflects a Congressional frustration that the "drafting problems and interpretations of [Section 924(c)] in recent Supreme Court decisions have greatly reduced its effectiveness as a deterrent to violent crime."  Id. at 312, reprinted in 1984 U.S.C.C.A.N. at 3490.

rather than concurrently with that of the predicate crime,[28] (2) substantially increasing the mandatory penalties for violations,[29] and (3) denying parol or probation privileges during the 924(c) sentence.[30]  The statute was also amended to increase the penalties for various classes of weapons -- e.g., short-barrelled shotguns and rifles, automatic weapons, and firearms equipped with silencing devices.[31]  Consequently, the legislative history does not support a holding that verdict specificity as to the actual firearm used is required.

### 3.    Interpretive Case-Law and the Issue of Duplicity

We find additional support for this conclusion in the federal cases interpreting the statute.  Most telling is the line of cases which instructs that the number of firearms "used" or "carried" is irrelevant for conviction purposes; employment of more than one firearm will not support more than one conviction under 924(c) based upon the same predicate crime.  <u>United States v. Privette</u>, 947 F.2d 1259, 1262-63 (5th Cir. 1991), <u>cert. denied</u>, ___ U.S. ___, 112 S. Ct. 1279 (1992).  The fact that

_____

[28] <u>See</u> Omnibus Crime Control Act of 1970, Pub. L. No. 91-644, 84 Stat. 1880, <u>reprinted in</u> 1970 U.S.C.C.A.N. 2206, 2216-17.

[29] Ibid. <u>See also</u> Comprehensive Crime Control Act of 1984, <u>supra</u> note 24, 98 Stat. at 2138-39; Anti-Drug Abuse Act, Pub. L. No. 100-690, § 6460, 102 Stat. 4181, 4373-74 (1988).

[30] Comprehensive Crime Control Act of 1984, <u>supra</u> note 24, 98 Stat. at 2139.

[31] Firearms Owners' Protection Act, <u>supra</u> note 24, 100 Stat. at 457; Crime Control Act of 1990, Pub. L. No. 101-647, § 1101, 104 Stat. 4789, 4829.

virtually all federal courts consider it to be one offense regardless of how many weapons are actually "used or carried" tends to shed light upon the federal courts' view of the level of concurrence necessary. See, e.g., United States v. Henning, 906 F.2d 1392, 1399 (10th Cir.), cert. denied, ___ U.S. ___, 111 S. Ct. 789 (1990); United States v. Henry, 878 F.2d 937, 942 (6th Cir. 1989); United States v. Fontanilla, 849 F.2d 1257, 1258-9 (9th Cir. 1988). But see United States v. Freisinger, 937 F.2d 383, 390 (8th Cir. 1991) (although one predicate crime may support multiple counts based upon number of weapons, sentences must run concurrently). The reasoning in these cases reinforces our conclusion that the focus of the statute is upon the use of any firearm so long as it is used in the commission of an enumerated predicate crime. As noted above, where alternative factual scenarios will support only one crime even if all are proven, the courts appear less likely to require factual concurrence. E.g., Schad, 111 S. Ct. at 2496 ("In Arizona, first degree murder is only one crime regardless whether it occurs as a premeditated murder or a felony murder.'") (quoting State v. Schad, 788 P.2d 1162, 1168 (1989)); United States v. Sutherland, 656 F.2d 1181, 1202 (5th Cir. 1981) (no need for jury to agree as to single object in multiple-object conspiracy), cert. denied, 455 U.S. 949 (1982). Cf. Hill, 971 F.2d at 1468 (Jurors need not agree as to which predicate crime was the intended objective of a conspiracy to violate Section 924(c) as long as they are convinced that each conspirator intended to use

36

a firearm in the commission of **a** drug trafficking offense).

Conversely, where each instance of allegedly criminal activity

could be a separate offense, courts are more inclined to require

that jurors be unanimous as to which instance is the basis of

liability. Holley, 924 F.2d at 928-29. See also United States

v. Payseno, 782 F.2d 832, 837 (9th Cir. 1986) (Where three

separate acts of extortion, directed at different victims, are

introduced in support of one count, jury must agree as to one

such act for the basis of liability.); Beros, 833 F.2d at 460-62

(Jury must unanimously agree as to which act was committed by the

defendant where each of two challenged counts alleges multiple

theories of criminal activity predicated on several transactions

"any of which might have provided the basis for a guilty

verdict."). Although, as we stated earlier, duplicity is not the

sole consideration for determining whether unanimity is

necessary, it is a relevant concern, and it weighs heavily in

favor of the government's position in this case.

Other cases expanding the reach of Section 924(c) are

enlightening from a corollary standpoint. For example, this

court has determined that Section 924(c)'s qualification that the

weapon be used "during and in relation to" a crime means only

that the firearm have played "an integral part [in] the felony."

United States v. Robinson, 857 F.2d 1006, 1010 (5th Cir. 1988).

The weapon need not actually be used or brandished. United

States v. Coburn, 876 F.2d 372, 375 (5th Cir. 1989). The firearm

does not even have to be visible. Robinson, 857 F.2d at 1010

37

(citing with approval United States v. Matra, 841 F.2d 837, 839 (8th Cir. 1988)). Moreover, an unloaded gun can serve as the basis for a conviction. Coburn, 876 F.2d at 375. As in the instant case, "[i]t is enough that the firearm was present at the drug-trafficking scene, that the weapon could have been used to protect or facilitate the operation, and that the presence of the weapon was in some way connected with the drug trafficking." United States v. Boyd, 885 F.2d 246, 250 (5th Cir. 1989). These broad-sweeping interpretations of the "during and in relation to" provision demonstrate this court's willingness to construe the statute broadly.

Correa argues that the Third Circuit's opinion in United States v. Theodoropoulos, 866 F.2d 587, 597 (3d Cir. 1989), should be adopted by this court for the proposition that specific unanimity is required as to which gun was the basis for a Section 924(c) conviction. In Theodoropoulos, the court of appeals was presented with a fact-setting similar to that in the instant case. The Third Circuit noted with approval that the trial judge had "properly instructed the jury that they must unanimously agree on which weapon [the defendant] had used . . . ." Id.[32] Although giving such an instruction may be proper if the court

_____

[32] The court in Theodoropoulos focused upon whether the evidence was sufficient to support each gun alleged to have been used in the cocaine trafficking conspiracy. United States v. Theodoropoulos , 866 F.2d 587, 597 (3d Cir. 1989). Finding that three of the guns could not have legally supported the conviction since they were not sufficiently proximate to the crime scene to be considered to be "in relation to" the predicate drug offenses, the court of appeals vacated the Section 924(c) conviction on that basis.

believes it to be warranted by the facts,[33] we do not read
Theodoropoulos to require it.

### 4.    Particulars of the Instant Case

Finally, we turn to the facts of the instant case and the
likelihood of jury confusion from the evidence presented.  As
discussed above, at least four of the firearms seized from
Correa's residence were indisputably linked to drugs or to
conceded proceeds.  See supra note 7.  As noted previously, the
district court instructed the jury that, in order to convict
Correa of the Section 924(c) violation:

> [Y]ou must be convinced that the Government has proved
> . . . beyond a reasonable doubt:  that the Defendant
> knowingly used or carried a firearm during and in
> relation to the Defendant's commission of the crimes
> alleged in Counts One or Two.
>
> You are instructed that possession alone of a
> firearm is not sufficient to find the Defendant guilty
> of Count Three.  You must be convinced beyond a
> reasonable doubt that **at least one** of the firearms in
> evidence played a role in or facilitated, or had the
> potential of facilitating, the commission of a drug
> offense.  In other words, you must find that **at least
> one** of the firearms was an integral part of the drug
> offense charged . . . .

(emphasis added).  The court further instructed the jury that
"[t]o reach a verdict, all of you must agree.  Your verdict must
be unanimous on each count of the Superseding Indictment."  In
light of our holding that an additional, specific unanimity
instruction was not mandated, we find these instructions to be

---

[33] As the Supreme Court noted in Schad, "[w]e do not, of
course, suggest that jury instructions requiring increased
verdict specificity are not desirable . . . .  We only hold that
the Constitution did not command such a practice on the facts of
this case."  111 S. Ct. at 2504.

39

sufficient. It would not appear that the individual jurors were confused by the introduction of firearms not specifically tied to drug trafficking, since the court specifically charged the jurors to consider only those weapons which "played a role in or facilitated, or had the potential of facilitating, the commission of a drug offense."

## V. Conclusion

In sum, we find that a specific unanimity instruction was not required with respect to the identity of the firearm "used" or "carried" by Correa.[34] In doing so, we recognize that verdict specificity may be required for some violations of 18 U.S.C. § 924(c).[35] Even if we were permitted to do so, we would not be

---

[34] In his post-submission brief, Correa argues that a unanimity instruction was also required with respect to the predicate crime upon which the 924(c) conviction was based. He claims that some members of the jury could have believed the firearms were used in furtherance of the cocaine possession alleged in Count One and others that the guns were used to protect the marijuana charged in Count Two. This contention was not preserved in the trial court and was not briefed in this court prior to argument. Accordingly, we do not determine whether the failure to give a specific unanimity instruction, requiring agreement on the predicate crime, was in error. See Baris v. Sulpicio Lines, Inc., 932 F.2d 1540, 1548 n.11 (5th Cir.), (Court will not consider contentions raised for the first time in briefs submitted after oral argument.), cert. denied, ___ U.S. ___, 112 S. Ct. 430 (1991).

[35] We do note (without deciding) that a different situation may be presented when the evidence tends to prove the use of more than one weapon, and the firearms proven fall within different classes of Section 924(c)'s proscribed weapons. For example, if a firearm violation is asserted, and evidence is introduced as to both shotguns and rifles (with a mandatory 5-year imprisonment penalty) and revolvers with silencing equipment (resulting in a 30-year imprisonment), the jury may well be required to agree on which type of weapon was used in order for the court to assess the appropriate penalty. In that instance, a unanimity instruction as to the class of weapon may be necessary, since the

40

able to predict in an advisory fashion which fact-settings will necessitate such protection.  As discussed above, such determinations must be made on a case-by-case basis in light of the charges made, the evidence presented, and the likelihood of jury confusion.  We hold only that, under the facts of this case, no such instruction was warranted, especially in light of the general instruction that was given.  Accordingly, we AFFIRM the judgment of the district court.

DUPLANTIER, District Judge, concurring:


I concur, with the following brief additional observation concerning the requested "unanimity gun" charge.

The issue as to the district judge's refusal to give the requested jury charge to the effect that the jury had to agree unanimously on which one of the ten guns was used or carried during and in relation to the drug trafficking crime is a close call, as demonstrated by the well-reasoned majority opinion. Indeed, I have given a similar charge under quite similar circumstances when requested to do so.  However, I am convinced that, properly interpreted, the statute (18 USC 924(c)) requires only that all twelve jurors agree that, during and in relation to

---

legislature, in amending Section 924(c) to provide varying penalties for certain classified firearms, appears to have indicated its intent that a unanimous verdict be reached with respect to the given class of firearms. United States v. Sims, 975 F.2d 1225, 1235-36 (6th Cir. 1992), cert. denied, ___ U.S. ___, 113 S. Ct. 1315 (1993).

41

a drug trafficking crime, the defendant used or carried a firearm (any firearm).  The statute does not require that all jurors agree on a particular firearm.

A hypothet illustrates the point.  Assume that a rifle and a pistol are found in the room in which the defendant is apprehended during a drug transaction.  A single count in an indictment charges that both firearms were "used and carried" "during and in relation to" the drug activity, and the prosecutor argues to the jury that both firearms were so used.  Defendant contends that both were collector's items.  Six jurors conclude that the government proved beyond a reasonable doubt that the rifle was "used", but not the pistol.  The other six conclude that there is reasonable doubt about the rifle, but that there is no doubt that the pistol was "used" in the drug crime.  The defendant would properly be found guilty of violating the statute, for each juror would have concluded that defendant used or carried "a firearm" during and in relation to the drug trafficking crime charged in the indictment.

I conclude that the defendant was not entitled to the requested "unanimity gun" charge.